METROPOLITAN SEWERAGE COMMISSION OF COUNTY OF MILWAUKEE, Respondent, v. R. W. CONSTRUCTION, INC., and another, Appellants.*

*No. 676 (1974). Argued March 1, 1976.—Decided May 4, 1976.*
(Also reported in 241 N. W. 2d 371.)

* Motion for rehearing denied, without costs, on June 30, 1976.

For R. W. Construction, Inc., there were briefs by *Elwin J. Zarwell, Peter W. Bunde, Ronald L. Wallenfang* and *Quarles & Brady,* attorneys, and *Joseph Swietlik* and *Laikin, Swietlik & Laikin,* of counsel, all of Milwaukee, and oral argument by *Mr. Zarwell.*

For Fidelity and Deposit Company of Maryland there were briefs by *John & Meyer* of Milwaukee.

For the respondent there was a brief by *Ewald L. Moerke, Jr., Robert Arthur Melin* and *Schroeder, Gedlen, Riester & Moerke,* of Milwaukee, and oral argument by *Ewald L. Moerke, Jr.*

A brief amicus curiae was filed by *Harold I. Rosen, John A. McWhorter* and *King & King, Chartered,* of Washington, D. C., for the Associated General Contractors of America.

WILKIE, C. J.  This appeal involves a controversy over the construction on behalf of the plaintiff-respondent Metropolitan Sewerage Commission of the County of Milwaukee (MSC) of an 8,300-foot segment of underground concrete sewer beneath South 84th Street in West Allis, Wisconsin, running from West Adler to West Grant. The sewer was to have a diameter of 8 feet and was to be located about 100 feet below ground. It was to be one segment of a gravity-flow sewer system discharging at the South Shore Sewerage Treatment Plant in Oak Creek.

The most important parts of the plans and specifications provided to bidders were drawings which depicted the results of borings which the MSC caused to be made into the subsurface along the sewer route. Such borings are the typical means of apprising bidders of subsurface conditions which they are likely to encounter in tunneling underground. Sixteen test borings were made by Milwaukee Testing Laboratory, Inc., at about 500-foot intervals along the sewer route. The typed logs of these

borings were eventually delivered to Alvord, Burdick & Howson, a Chicago consulting firm which prepared the contract drawings from these logs.

The contract drawings of the 16 borings showed the 100 feet at and above the level of the tunnel to be composed of the glacial till deposited by the retreating glaciers which covered Wisconsin millions of years ago. This glacial till is an irregular, chaotic type of soil. In very general terms, however, the borings indicated a clay layer interspersed with pockets of silt and sand in the first 50–70 feet below the ground. Clay is an impermeable soil which does not hold a great deal of water and through which water does not easily pass. Beneath this layer a layer of more permeable soils like sand and gravel was indicated, although substantial pockets of clay were also shown. Sand and gravel are permeable soils which can contain a great deal of water and through which water easily flows. Just below the glacial till (and the level of the tunnel) was limestone bedrock.

The contract drawings also indicated that a great deal of ground water was present. In general, the water table was shown as about 40–50 feet below ground. The presence of water increases the difficulty of underground construction, because the water must be controlled by using compressed air in the tunnel to force the water away from the construction, or by using deep wells to draw down the water table, or by a combination of these two methods. But artesian water creates many more construction problems than static water. Artesian water is water under hydrostatic pressure because it is confined between impermeable layers of soil. Such a water-containing layer is called an artesian aquifer and it has a recharging capacity which frustrates easy dewatering. Static water, on the other hand, is ground water that is not under pressure and is not replaced once removed or drawn down. None of the contract drawings affirmatively indicated the presence of artesian water. The drawings stated only "water at" a certain level, whereas

the accepted manner of indicating artesian water is to note "water encountered at" a certain level and then to state that the water "rose" in the boring to another higher level. In fact, although the log of boring No. 8 typed by Milwaukee Testing Laboratory, Inc., stated "Water encountered at 35'/Rose in hole to 16'6'','" this information was deleted from the contract drawing of boring No. 8, which stated only "water at el. 120.7."

Several bids were submitted and R. W. Construction, the defendant-appellant here, was the successful bidder, having bid 3.9 million dollars. Three other contractors (Peter Kiewit Sons' Company, W. J. Lazynski, Inc., and S & M Constructors) bid, respectively, 4.5, 4.9, and 4.95 million dollars.

The contract (MSC Contract No. 222) contained the following changed-conditions clauses:

"20. *Changed Conditions.* Should the Contractor encounter, or the Sewerage Commission discover during the progress of the work, subsurface and (or) latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, the attention of the Engineer shall be called immediately to such conditions before they are disturbed. The Engineer shall thereupon promptly investigate the conditions and, if he finds that they materially differ from those shown on the drawings, or indicated in the specifications, he shall at once, make such changes in the drawings and (or) specifications as he may find necessary and any increase or decrease of and (or) difference in time resulting from such changes shall be adjusted as provided in Paragraph 19 of this contract."

Paragraph 19 of the contract provided:

"19. *Changes.* The Engineer may at any time, by a written order and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. No

changes shall be made without first obtaining the approval in writing of the Engineer or his duly authorized representative. Any claim for adjustment under this article must be asserted within ten (10) days from the date the change is ordered, unless the Engineer shall for proper cause extend such time. But nothing provided in this article shall excuse the Contractor from proceeding with the prosecution of the work so changed."

The parties entered into the contract on May 6, 1969, and R. W. began to sink its workshaft in August. Almost immediately, R. W. ran into artesian water, a condition which persisted throughout the construction period. When the shaft was down only 37 feet, water "boiled up" and broke through under the sheeting, bringing with it running silt and sand. Similar problems were encountered all the way to the level of the sewer tunnel, causing delays and costing R. W. much more than its bid estimates.

The next major encounter with this artesian condition occurred in January 1970, after the shaft had been sunk 100 feet to tunnel grade, and as R. W. was attempting to "turn the eye" horizontally in order to begin mining for the tunnel. A mixed face of running silt and sand above and clay below was encountered. After even the extraordinary method of freezing the soil with liquid nitrogen did not work, R. W. consulted Arthur Chase, an engineering consultant with extensive tunneling experience. He recommended lowering the tunnel grade three feet into the clay in order to avoid the top layer of running silt and sand. This change was approved by the MSC and made under the changed-conditions clause.

Between May and September of 1970, R. W. mined about 950 feet of the tunnel. Water was controlled by a combination of compressed air and deep wells. On September 29, 1970, however, as the workers were locking out, water broke through the tunnel heading, bringing with it a great deal of soil and flooding the heading. This breakthrough virtually halted mining progress. The running water and soil could not be controlled by R. W.'s

method of compressed air and well dewatering. In October R. W. called upon Franklin Patton, a professor and recognized dewatering expert. He recommended pumping and other tests to ascertain the scope of the dewatering problem, and an extensive deep-well program to draw down the ground water. R. W. did drill more wells, although not as many as recommended, since it was beginning to run short of money. About 50 feet of further progress was made in January of 1971.

In February of 1971 the final disaster occurred. Carbon-dioxide gas began to leak up through abandoned but unplugged wells in the area, and to settle in residential basements. Some of the compressed air used in tunneling had escaped from the tunnel, stripped the carbon dioxide from the ground water, and eventually carried it to the surface. On March 3d the West Allis Health Commissioner ordered both R. W. and the MSC to abate this serious health hazard. During the month of March the project was gradually shut down, the compressors and pumps turned off, and the tunnel face barricaded. Eventually, the carbon-dioxide levels dropped back below hazardous levels.

But this carbon-dioxide occurrence broke R. W.'s back. It sought to invoke the changed-conditions clause, and to receive an equitable adjustment in compensation, both because of the unanticipated artesian water condition and because the use of compressed air was now unfeasible. The MSC steadfastly refused any equitable adjustment, and on May 28, 1971, notified R. W. that, unless it resumed work within ten days, it would terminate the contract. R. W. refused to resume work without some changed-conditions relief, and in June the MSC terminated the contract.

In 1972, after an abortive first attempt, the MSC readvertised the remaining part of the project now known as Contract 222–A. About 85 percent of the project

needed to be completed. Lazynski bid $8.2 million for this work; Peter Kiewit, $9.3 million; and S & M, $11.7 million. Lazynski was awarded the contract and then pressed successfully for a number of changes in the contract before it began work. Lazynski eventually completed the work at the increased price.

The MSC won judgment in the amount of $5,531,955.81 as against R. W. The counterclaim of R. W. was dismissed on the merits. R. W. appeals from the judgment against it, including the dismissal of the counterclaim. The Fidelity & Deposit Company joins in that appeal. MSC, the respondent, cross-appeals against R. W. and Fidelity, claiming that judgment should be entered against Fidelity in the same amount as against R. W., and that prejudgment interest should be at the rate of 6 percent, rather than 5 percent.

One issue is controlling on this appeal: Did R. W. encounter an artesian water condition which materially differed from the conditions shown in the drawings and indicated in the specifications, so that it was entitled to receive an equitable adjustment in the contract price? We conclude that it did, and therefore we reverse and remand for further proceedings.

I. *Nature of changed-conditions clause.*

The changed-conditions clause is a contractual innovation designed for the mutual benefit of both the government and the contractor. The government benefits by the use of such a clause because the contractor no longer needs to add large contingency sums to his bid in order to cover the risk of encountering adverse subsurface conditions. The contractor benefits because he is awarded extra compensation if adverse subsurface conditions are encountered which materially differ from those indicated in the contract. Thus, much of the gamble is taken out of underground construction. The government does

not have to pay the contractor a windfall price when only normal conditions are encountered, and the contractor suffers no disaster when unanticipated conditions arise. Furthermore, both parties benefit by the existence of an informal machinery for resolving problems through negotiation rather than litigation.

There is a substantial body of federal law relating to changed-conditions clauses. The changed-conditions clause in the present case is what is known in federal parlance as a category-one changed-conditions clause, that is, a situation where encountered conditions materially differ from indicated conditions. Unlike Contract 222, many federal contracts also contain a category-two changed-conditions clause which covers a situation where unknown conditions of an unusual nature are encountered. The MSC contends that this fact renders all federal precedent inapplicable. This is not so, since nearly all federal cases involve category-one claims, and since all federal cases relied upon in our analysis here involve category-one claims.[1]

The trial court did not discuss at length any of these applicable federal precedents, although it did footnote several of them in its carefully constructed opinion. Instead, the court relied mainly on principles of equity jurisprudence, and on the common-law concepts of misrepresentation and mistake. However, as the federal cases point out,[2] the applicability of the modern changed-

---

[1] The two Wisconsin cases which have dealt with category-one changed-conditions claims are not helpful to the resolution of this case because of the posture in which they were presented to the court. *Scherrer Constr. Co. v. Burlington Mem. Hosp.* (1974), 64 Wis. 2d 720, 221 N. W. 2d 855; *Thomsen-Abbott Construction Co. v. Wausau* (1960), 9 Wis. 2d 225, 100 N. W. 2d 921.

[2] *Foster Const. C. A. & Williams Bros. Co. v. United States* (Ct. Cl. 1970), 435 Fed. 2d 873, 880, 881; *United Contractors v. United States* (Ct. Cl. 1966), 368 Fed. 2d 585, 597, note 6, and cases there cited.

conditions clause depends only upon a comparison of the actually encountered conditions with the indicated conditions, and not upon the fulfillment of equitable or common-law prerequisites to relief.

## II. *Standard of review.*

The two questions of (1) what conditions are "shown in the drawings or indicated in the specifications," and (2) whether actually encountered conditions "materially differ" from these indications are both questions of law, since they involve the interpretation and application of contracts. On this review we must independently review the lower court's resolution of these questions.[3] However, the third question of what conditions were actually encountered is purely factual,[4] and thus the trial court's findings in that regard cannot be upset unless they are contrary to the great weight and clear preponderance of the evidence.

## III. *Conditions actually found.*

The trial court specifically found that artesian water was actually encountered by R. W.:

"27. The real villain in this case is water in large quantity located in stratas of silts, sand, and gravel confined in stratas of impermeable rock or soil (usually clay) under hydrostatic pressure, thereby creating an artesian aquifer. The term 'impermeable' is used in the comparative sense—'less permeable' would be more accurate.

"28. An artesian aquifer, because the water is under pressure, evidences a recharging capacity greater than so-called static water and therefore requires a corre-

---

[3] *Stock & Grove, Inc. v. United States* (Ct. Cl. 1974), 493 Fed. 2d 629, 645; *Foster Const. C. A. & Williams Bros. Co. v. United States, supra,* footnote 2, at page 880.

[4] *Arundel Corp. v. United States* (Ct. Cl. 1975), 515 Fed. 2d 1116, 1123.

spondingly greater pumping capacity to reduce the water table. Unless the recharge rate is exceeded by the well discharge rate, the water table will not be lowered."

This finding of fact is not contrary to the great weight and clear preponderance of the evidence, and is conceded by all parties.

IV. *Actual conditions materially different.*

The trial court came to the legal conclusion that artesian water was "materially different" if not indicated in the contract documents:

"In the instant case there is no doubt that the conditions of artesian water if not indicated in the contract documents would be sufficiently disparate to be materially different."

This conclusion is obviously correct because of the recharging quality of artesian water and the consequent difficulty of removing it from a construction area.

Given that the "artesian water" was actually encountered, and that the presence of such artesian water was a materially different condition, the final question is whether the presence of artesian water was shown on the contract drawings or indicated in the contract specifications.

V. *Static water, not artesian water, was indicated in the contract drawings.*

Contract "indications" need not be explicit or specific, but only enough to impress or lull a reasonable bidder not to expect the adverse conditions actually encountered.[5] Yet the indications must still be reasonably plain or positive that conditions would be otherwise than actually found, or they must induce reasonable reliance

---

[5] *Stock & Grove, Inc. v. United States, supra,* footnote 3, at page 645.

that conditions will be more favorable than actually encountered.[6]

We conclude that the contract documents here clearly indicate static water, not artesian water. It is undisputed that the contract drawings of the borings do not state that water rose in the boring after it was encountered in drilling, which is the acceptable method of noting artesian water.[7] The drawings state only that the water level is at a certain depth. This is an affirmative indication of static water, not artesian water. This fact alone is enough to distinguish the present case from *Ragonese v. United States.*[8] In *Ragonese,* the borings set out the soil type but said nothing whatsoever about water, whereas here the contract borings indicate static ground water. On the same ground the present case is distinguishable from *Flippin Materials Co. v. United States.*[9] *Flippin* held that, where the contract borings indicated only that pockets of soil were present in a limestone layer, the contractor was not entitled to assume that these were sand pockets and not clay pockets, and was held to the information provided on available field logs that indicated clay pockets. Here, of course, the contract borings did not merely indicate ground water—they indicated static ground water as opposed to artesian ground water.

It is well settled that contractors are entitled to rely upon the borings as they are depicted in the contract

---

[6] *Pacific Alaska Contractors, Inc. v. United States* (Ct. Cl. 1971), 436 Fed. 2d 461, 469.

[7] *Ground Water Conditions in the Milwaukee-Waukesha Area, Wisconsin,* Foley et al. (U. S. Government Printing Office, 1953), p. 23, quoted by the trial court in its memorandum opinion. The boring logs made by D'Appolonia Consulting Engineers, Inc., for Lazynski in 1972 use this method to note an artesian condition throughout much of the tunnel area.

[8] (Ct. Cl. 1954), 120 Fed. Supp. 768.

[9] (Ct. Cl. 1963), 312 Fed. 2d 408.

drawings, since such borings are the most specific and usually the most reliable indicators of subsurface conditions.[10]

The trial court concluded that the contract borings indicated the presence or possibility of artesian water. Two reasons were adduced to support this conclusion. First of all, the trial court was of the opinion that the failure of the MSC and its agents to include the artesian notations on the typed log of boring No. 8 in the contract drawings was not crucial. This was so because the typed log "was available at the Commission [MSC] office and the bidding documents expressly invited inspection of the data by bidders." The bidding instructions did state that bidders "may have access" to the information gathered by the test borings and "requested" bidders to examine "all drawings and data."[11] However, the contract specifications, also part of the bidding documents, provided as follows:

"3. *BORINGS*
"The Metropolitan Sewerage Commission of the County of Milwaukee has made test borings along the route of that portion of the sewer in this contract. The logs and locations of these borings are shown on the drawings. . . ."[12]

This is a specific and express indication that the contract drawings accurately depict what is on the typed boring logs. In the light of this explicit indication, a generalized "invitation" to inspect those same logs cannot be held to impose a duty upon R. W. to check at the MSC office what is said to be already shown in the contract draw-

---

[10] *Foster Const. C. A. & Williams Bros. Co. v. United States, supra,* footnote 2, at page 887; *Woodcrest Construction Co. v. United States* (Ct. Cl. 1969), 408 Fed. 2d 406, 410. The trial court also recognized that the use of contract borings by MSC induced reasonable reliance upon those borings.

[11] Ex. No. 12.

[12] *Id.*

ings. Moreover, even if R. W. had inspected the typed logs, he would have found only a single artesian notation, that of boring No. 8. None of the other fifteen typed logs indicated in any way the presence of artesian water, even though it is conceded that artesian water was present throughout the tunnel area.

The trial court gave, as its second reason for deciding that the contract "indicated" the existence of artesian water, the conclusion that "water levels above a depicted layer of impervious soil such as clay could indicate a hydrostatic head in the aquifer below the clay." In this regard it must first be noted that, as Arthur Chase testified, many of the water levels indicated in the contract drawings were at or near (and not above) the bottom of the clay level, which is where they would be if the ground water were static. Thus this indirect evidence of artesian water is by no means uniform. Secondly, it is undisputed that this so-called clay layer is interspersed with substantial pockets of silt and sand, and that these sand seams often have water in them. As Thomas Peterson, who had worked as an engineer for both the MSC and R. W., testified, the fact that one encounters water near the surface in the Milwaukee area does not mean that the water level is up that high; it usually means that you have hit one of these water-laden pockets of silt or sand. Indeed, an examination of the water levels reflected in the contract drawings indicates that, in some of the instances where the water level is above the bottom of the clay layer, it is marked at a location where there is a pocket of silt or sand. Under these circumstances, it cannot be said that some water levels above the clay layer indicated the presence of an underlying artesian aquifer.

A contractor like R. W. is also held to the standard of what a reasonable contractor should have anticipated on the project. Although this standard is applied in mis-

representation cases,[13] it has also frequently been applied in changed-conditions cases.[14] The reason for applying this test in misrepresentation cases is that the contractor cannot be said to have been misled by the misrepresentations if he should have known about the condition in question. The rationale for applying it in changed-conditions cases is that it would be unfair for a contractor to receive an upward adjustment in price for a condition which any reasonable contractor would have anticipated in approaching the project. That which any reasonable contractor should have anticipated is derived from a blend of his past experience, the customs and insights shared generally by contractors in the area, and the information conveyed by the contract.

The trial court was of the opinion that R. W. should be held to a knowledge of the geological and hydrological information about the area contained in published scientific treatises. This is directly contrary to the rule that a contractor is not bound to make "a scientifically educated and skeptical analysis" of the contract documents and the general situation.[15] Moreover, all of the contractors who testified stated that they did not consult scholarly treatises in bidding on Contract 222, and did not generally consult them in their work.[16] In any event, the published scientific treatises regarding ground-water conditions in the Milwaukee area state only that artesian aquifers are found "in some places" in the area, and thus give only the most general type of indication of artesian water.

[13] *Leal v. United States* (Ct. Cl. 1960), 276 Fed. 2d 378, 383; *Ragonese v. United States, supra,* footnote 8, at pages 770, 771.

[14] *Woodcrest Construction Co. v. United States, supra,* footnote 10, at pages 409, 410; *United Contractors v. United States, supra,* footnote 2, at page 599.

[15] *Stock & Grove, Inc. v. United States, supra,* footnote 3, at page 631.

[16] *See, for example,* the testimony of Kenneth Peterson, the president of W. J. Lazynski, Inc.

From the record it appears that neither R. W.'s past experience on MSC projects nor the shared knowledge and insights of other contractors were sufficient to apprise R. W. of the artesian condition it encountered. The trial court specifically found that "none of the bidders on 222 truly estimated the artesian conditions and all would have been financially unsuccessful on the job." This finding was corroborated by the testimony of other contractors who had bid on 222, and by the fact that an artesian aquifer of such magnitude had not been encountered on prior MSC projects.

Finally, the trial court stated several times in its carefully worded memorandum opinion that even the MSC definitely did not know about or even consider the existence of artesian water. In fact, Anthony Pitrof, a supervisory engineer in MSC's construction division, with twenty-seven years' experience with the MSC, twice testified that he did "not know anything about artesian water." Surely, as was said in the *Foster Case*,[17] if the condition in question was not known to the government, then bidders could not be expected to learn what the government itself did not know.

Under the circumstances presented by this record, we cannot conclude that R. W. should have anticipated the large, interconnected artesian aquifer which it encountered.

VI. *Inadequacy of design and method.*

It is settled that the MSC is deemed to warrant the adequacy of its plans and specifications to the extent that compliance therewith will result in satisfactory completion of the contract.[18] It is also settled that the

---

[17] *Supra,* footnote 2, at page 885.

[18] *Fattore Co., Inc. v. Metropolitan Sewerage Comm.* (7th Cir. 1974), 505 Fed. 2d 1, 5; *Jefferson Construction Co. v. United States* (Ct. Cl. 1968), 392 Fed. 2d 1006, 1011.

parties may, by the inclusion of a changed-conditions clause, convert this claim for breach of warranty into a matter for equitable adjustment between the parties.[19] The reason why design features of a contract are within the scope of the changed-conditions clause is that in certain cases they reasonably "indicate" the subsurface conditions likely to be encountered.[20]

In the case at bar, we conclude that the location of the sewer along the curbline of 84th Street was not "the most economical design" for the job, as the instructions to bidders specifically warranted.[21] The location of the sewer along the curbline reasonably indicates that only partial dewatering will be necessary, that is, a fairly small number of deep wells, probably all on one side of the street. Partial dewatering is indicated because the presence of overhead utilities, the proximity of private property, and the volume of traffic along 84th Street, all give rise to the inference that extensive well-drilling will not be required. However, it is conceded that, under the conditions encountered, an extensive well-drilling program, with a large number of wells, was required in order to draw down the large, interconnected artesian aquifer. Indeed, before Lazynski began work on the completion contract, there was a massive change in location of the sewer, away from the curbline and onto the state fair grounds, partly in order to "permit a more efficient dewatering system."[22]

[19] *Jefferson Construction Co. v. United States, supra,* footnote 18.

[20] *Foster Const. C. A. & Williams Bros. Co. v. United States, supra,* footnote 2, at page 875.

[21] Document No. 12.

[22] Letter of MSC Chief Engineer and General Manager to W. J. Lazynski, Inc., dated July 10, 1972. Ex. No. 8340. *See also:* Ex. No. 7603, which shows the revised alignment, and the testimony of Anthony Pitrof on this point.

We also conclude that the contract documents reasonably indicated that conditions were such that compressed air could be used. When the carbon-dioxide problem arose and compressed air could no longer be used, there was thus a change in conditions which should have triggered negotiations for an equitable adjustment. It is conceded that all the bidders on Contract 222 who testified stated that they intended to use at least partial compressed aid in order to control the ground water. In addition, the contract provided as follows:

"18. *COMPRESSED AIR*
"The Contractor may, at his option, use compressed air in part or all of the work. . . ."

The MSC argues vigorously that the use of the word "may" means that the contractor had no absolute right to use compressed air, and that, once the $CO_2$ problem was encountered, he was required to cease using air without any adjustment for the cost of alternative methods. On the contrary, the use of the word "may" in this clause merely vests the contractor with the right to use compressed air, if he should so choose. If he does choose the use of air (as R. W. did), and if subsequent underground conditions render the use of this method impossible, he is entitled to an equitable adjustment under the changed-conditions clause.

VII. *Factors which confirm changed conditions.*
There are two important factors in this record which confirm the conclusion that R. W. encountered changed conditions. The first is the cost of completing the project. W. J. Lazynski, Inc., bid and received in excess of 8 million dollars for completing 85 percent of the work which R. W. had agreed to perform for less than 4 million dollars. Lazynski itself had originally bid less than 5 million dollars for the entire job. The trial court

specifically found that the "substantial increase in the Lazynski bid on 222–A is not explained solely by inflation and increased workmen's compensation rates." The inference which is compelled by these facts is that Lazynski increased its bid because it had become aware that the conditions actually encountered by R. W. materially differed from those originally indicated in the contract 222 drawings.

The second confirmatory factor is the increased compensation which Lazynski received from the MSC for work which it had originally subcontracted to do for R. W. The facts regarding this subcontract are undisputed and are set forth in the trial court's findings of fact.[23] Lazynski was the contractor on an adjoining segment of the sewer tunnel, and subcontracted to do the extreme northern portion of R. W.'s segment for the unit prices which it had set forth in its original bid for Contract 222. When the contract between the MSC and R. W. was terminated, Lazynski would have been entitled to about $38,000 under the subcontract price for the work that remained. However, the MSC added this work on a cost-plus basis to the contract for the adjoining segment, and eventually agreed to pay in excess of $86,000 for it. Although factors not relevant to changed conditions were the cause of some of this increase, it is undisputed that one of the reasons for the increase was "running silt and sand" which Lazynski encountered in doing the work. The inference is that at least part of the increased compensation received by Lazynski was attributable to actually encountered conditions like those encountered by R. W.

VIII. *R. W.'s deficiencies are related to damages, not liability.*

The fundamental error of law made by the trial court was to consider R. W.'s deficiencies in prebid planning

---

[23] Findings of Fact Nos. 177–186.

and postaward performance as centrally relevant to, and in fact conclusive of, the question of whether R. W. was entitled to an equitable adjustment under the changed-conditions clause. Thus, for example, the trial court found as follows:

"Without advance investigation, without advance planning, without an organized attack (with respect to dewatering wells) upon the dewatering problems as they presented themselves, R. W. plodded along upon a relatively unaltered course into deeper and deeper water."

The centrality of this factor in the trial court's analysis is demonstrated by the fact that it is mentioned no less than a dozen times during the discussion of R. W.'s entitlement to an equitable adjustment. The trial court found R. W. to be deficient in a number of respects, including failure to plan for dewatering in advance, failure to locate deep wells in any systematic fashion, failure to respond to Patton's recommendation for more extensive dewatering due to financial difficulties, and failure to use more gravel-pack rather than churn wells.

These findings of the trial court are not contrary to the great weight and clear preponderance of the evidence. But, even so, they go to the element of damages, and not to the right of R. W. for an equitable adjustment under the changed-conditions clause.[24]

In this case R. W. argues that its damages are readily determinable, and sets forth a summary of damages amounting to nearly 3 million dollars.[25] However, this summary does not take account of the fact that the contractor must absorb those costs, if any, due to its inefficiency in planning and performance. Under these circumstances our holding here is limited to concluding that the MSC is liable for an equitable adjustment under

[24] *Roscoe-Ajax Construction Co. v. United States* (Ct. Cl. 1972), 458 Fed. 2d 55, 60.
[25] Ex. A, Appellants' brief.

the changed-conditions clause, and therefore we remand the case to the trial court for a hearing to determine the amount of the equitable adjustment to which R. W. is entitled. In so doing, we follow the same general procedure followed by the 7th Circuit in the *Fattore Cases*,[26] which were diversity actions applying Wisconsin law in which the MSC was a party.

The manner in which contractor deficiencies operate to reduce the amount of the equitable adjustment is settled. The amount of equitable adjustment to which a contractor is entitled is the difference between what it reasonably cost to do the work under the actually encountered conditions and what it would have cost if the materially different conditions had not been encountered.[27] However, if the trial court reasonably determines that there is no more reliable method of computing damages, it may resort to a jury-type verdict which is a fair and reasonable approximation of these damages.[28]

In either case the findings relating to contractor inefficiency will in all probability, reduce the amount of damages. Thus, in the case at bar, although the contract drawings do not indicate a large artesian aquifer, they do indicate a substantial amount of ground water. If the trial court determines that R. W. failed to properly take account of these indicated conditions in its planning and bidding, then the amount of the equitable adjustment cannot be based upon R. W.'s original bid estimate. Instead, a higher amount, corresponding to the cost of controlling the large amount of static ground water indicated by the contract documents, must be employed

[26] *Fattore Co., Inc. v. Metropolitan Sewerage Comm.*, *supra*, footnote 18; *Fattore Co. v. Metropolitan Sew. Com'n, Co. of Milwaukee* (7th Cir. 1971), 454 Fed. 2d 537.

[27] *Roscoe-Ajax Construction Co. v. United States*, *supra*, footnote 24, at page 60, and cases there cited.

[28] *Fattore Co., Inc. v. Metropolitan Sewerage Comm.*, *supra*, footnote 18, at page 3, *et seq.*

in estimating damages. Similarly, in regard to R. W.'s ineffective postaward performance, if the trial court determines that R. W.'s methods unreasonably inflated its out-of-pocket expenses or that some other methods would have been less expensive, then a lower figure must be employed in estimating reasonable out-of-pocket expenses.

IX. *Admonitory and exculpatory provisions in the contract.*

The MSC cites several contractual provisions which warn the contractor of possible difficulties, impose upon the contractor the costs of performing the work, and relieve the MSC of liability if difficulties are encountered.[29] It is well settled that such broad admonitory and exculpatory clauses do not restrict the application of the changed-conditions clause, and the trial court so held.[30] In fact, the MSC unsuccessfully attempted this same argument in *Fattore*.[31] To allow such provisions to cancel out the changed-conditions clauses would destroy the whole equitable-adjustment procedure which the MSC has agreed to when materially different conditions are encountered.

X. *Notice of claim.*

The MSC also argues that R. W. cannot take advantage of the changed-conditions clause because it did not notify

[29] Ex. No. 12 at Instructions to Bidders: General Conditions, Section II, Paragraph 1; Contract, Article 1; Specifications, Paragraphs 19, 53, 57, 58.

[30] *Woodcrest Construction Co. v. United States, supra,* footnote 10, at page 410; *United Contractors v. United States, supra,* footnote 2, at page 598; *Fehlhaber Corp. v. United States* (Ct. Cl. 1957), 151 Fed. Supp. 817, 825, certiorari denied, 355 U. S. 877, 78 Sup. Ct. 141, 2 L. Ed. 2d 108.

[31] *Fattore Co. v. Metropolitan Sew. Com'n, Co. of Milwaukee, supra,* footnote 26, at page 542.

the chief engineer of the materially differing conditions before they were disturbed, as provided by the changed-conditions clause. The trial court found that R. W. did not waive its right to invoke the changed-conditions clause. We agree.

The changed-conditions clause in this case provides that the chief engineer has a duty to make an investigation regarding changed conditions when either the contractor or the MSC discovers changed conditions and the matter is brought to the chief engineer's attention. It is undisputed here that the MSC, through its resident engineer, discovered the same changed conditions which R. W. did, and at the same time. Thus, both the contractor and the MSC were under a duty to call the changed conditions to the attention of the chief engineer. Because one of the main tasks of the resident engineer is to report to the office of the chief engineer and the general manager concerning the progress of the work, it can be presumed that the chief engineer's attention was, in fact, called to the changed conditions as they arose. The MSC does not seriously contend that it did not know about the changed conditions as they were encountered, nor does it argue that it was prejudiced by the failure of R. W. to immediately cease work and bring the matter to the attention of the chief engineer.

The rule is that such a provision requires only that the attention of the appropriate government agent be called to the condition in question, and does not require that the contractor make a formal notice of claim.[32] This requirement was obviously fulfilled.

[32] *General Casualty Co. of America v. United States* (Ct. Cl. 1955), 127 Fed. Supp. 805, certiorari denied, 349 U. S. 938, 75 Sup. Ct. 783, 99 L. Ed. 1266; *Shepherd v. United States* (Ct. Cl. 1953), 113 Fed. Supp. 648; *Joseph Meltzer, Inc. v. United States* (Ct. Cl. 1948), 77 Fed. Supp. 1018. The clause in the case at bar is almost identical to the older federal changed-conditions clause, first adopted in 1926. The latest federal changed-conditions clause, first used in 1968, imposes more stringent notice requirements upon the contractor.

XI. *Excused performance.*

Wisconsin has long followed the doctrine that a material breach by one party excuses subsequent performance by the other party.[33] In the case at bar we conclude that the persistent refusal of the MSC to negotiate an equitable adjustment was a material breach of contract which justified R. W.'s refusal to continue performance without some form of additional financial assistance. The materiality of this breach is established by three factors: (1) the outright refusal of the MSC to act on the changed-conditions claim and to attempt negotiation of an equitable adjustment; (2) the substantial increase in R. W.'s costs caused by the changed conditions; and (3) R. W.'s need for current funding by an equitable adjustment in order to continue the project.

However, it must be emphasized that it is only in an extraordinary situation like the present one that the contractor is justified in refusing to perform further. Unless the above factors are present, the contractor should complete the contract even if it disagrees with the MSC's resolution of its changed-conditions claim, and afterwards maintain an action for breach of contract. The contractor cannot be permitted to hold the threat of work cessation over the MSC's head as it is deciding changed-conditions claims. Such a situation would stifle the mutual cooperation in the face of difficult conditions which it is the purpose of the changed-conditions clauses to foster.

XII. *Other changed-conditions claims.*

R. W. also claims that it encountered materially different water levels and soil types than those indicated in the contract drawings. The trial court concluded that, despite some variations in regard to these conditions, the water levels and soil types which R. W. encountered were sub-

[33] *Entzminger v. Ford Motor Co.* (1970), 47 Wis. 2d 751, 755, 177 N. W. 2d 899, and cases there cited; *see also:* 17 Am. Jur. 2d, *Contracts*, p. 807, sec. 365.

stantially like those indicated on the contract drawings, or those which could reasonably be inferred from the contract drawings, considered in their entirety.[34] We agree. As for water levels, R. W. could not reasonably believe that the water level at boring No. 6 was only 72 feet, when all of the other borings in that area indicated water levels of between 98 and 120 feet. The only reasonable inference was that the water levels would be at the 100-foot level or higher. Nor is the fact that all of the water levels actually encountered were slightly higher than this, averaging about 120 feet, a material difference from this inferred level of 100 or more feet. As for soil types, the contract drawings indicate a glacial till, the character of which varies drastically within short distances. Under these circumstances, R. W. cannot complain that boring No. 9 did not correctly indicate the soil types at the point where it shut down, when boring No. 9 was taken at a point more than 200 feet past the point where it shut down.

Because of our decision herein and our consequent remand, we do not reach the merits of MSC's cross-appeal.

*By the Court.*—Judgment reversed and cause remanded for further proceedings not inconsistent with this opinion.

---

[34] Findings of Fact Nos. 63, 64, 66, 67, 93.