James HARRIS, Plaintiff-Appellant-Petitioner,

v.

METROPOLITAN MALL, John L. Borman, Roger Dyson, Donald Clark and Gordon Carncross, Defendants-Respondents.†

Supreme Court

*No. 81–1475. Argued March 29, 1983.—Decided June 1, 1983.*

(Also reported in 334 N.W.2d 519.)

† Motion for reconsideration denied, with costs, on July 1, 1983.

488

489

For the petitioner there were briefs by *Richard E. Rosenberg* and *Nowlan & Mouat,* Janesville, and oral argument by *Mr. Rosenberg.*

For the respondents there was a brief by *Daniel W. Hildebrand, Steven J. Kirschner* and *Ross & Stevens, S.C.; A.J. Feifarek* and *Bakken, Feifarek & Taylor; Roger G. Schnitzler* and *Van Metre, Hanson, Clark & Schnitzler;* and *Mel J. Cyrak,* all of Madison, and oral argument by *Mr. Hildebrand.*

DAY, J. This is a review of an unpublished decision of the court of appeals which affirmed a judgment of the circuit court for Dane county, Hon. Richard W. Bardwell, Judge. That judgment awarded the plaintiff in this breach of contract action,[1] James Harris, damages totalling $42,834.00[2] plus interest at the legal rate from June 3, 1977 to July 28, 1981, the date of the trial court's judgment.

The issues considered in this review are:

---

[1] This action was orginally commenced against Harris by the Metropolitan Mall partnership to foreclose on a land contract held on the Metropolitan Mall building. Harris answered the complaint and filed a counterclaim in that case and brought a third-party action against the individual defendants to enforce guarantees they had made in connection with the transaction. The foreclosure action was terminated by the sale of the mall property on June 3, 1977. This action continued to trial. We will continue the designation used by the trial court judge in referring to Harris as the plaintiff and the Metropolitan Mall et. al. as the defendants.

[2] The damage award consisted of the following items:

1. Unpaid rent on the Metropolitan Mall building from November 1, 1975 to June 3, 1977 ........ $14,250.00
2. Out-of-pocket expenses following the mall's breach of its lease ................................. $19,584.00
3. Diminution of Harris' investment ............ $ 9,000.00

Total. $42,834.00

Harris does not challenge the damage awards set out in one and two above.

1. Should a land contract for the sale of a building and a lease on that building running from the buyer of the building to the sellers thereof which are executed on the same date be construed together?

2. Does an individual who has been injured by the breach of a sale-leaseback contract have the option of seeking the restitution of his investment in the contract as a remedy for the breach?

3. Does a guaranty executed as part of a lease which is made as part of a sale-leaseback arrangement and which obligates the guarantors to "pay to the landlord . . . all damages that may arise in consequence of any default by the tenant under such lease . . ." make the individuals liable as guarantors for restitution sought as the result of the breach of a sale-leaseback contract?

We conclude that the land contract and accompanying lease agreement must be construed together. We also conclude that the injured party may seek restitution of his investment in an action for breach of a sale-lease-back contract. Finally, we conclude that the guaranty executed here obligates the individuals as guarantors to make the restitution of the injured party's investment. We therefore reverse the decision of the Court of Appeals and remand the case to the trial court.

This action involves the sale and leaseback of a shopping center mall building located in Monona, Wisconsin. The building was owned by a partnership, Metropolitan Mall. That partnership consisted of John Borman, Roger Dyson and the James Madison Development Corporation. The sole stockholders of the corporation were Donald Clark and Gordon Carncross. Unless otherwise specified, these individuals and the partnership will be collectively referred to as the Mall Group.

The shopping center project was initiated by the Mall Group in early 1973. Construction of the outer shell of the building was commenced in the spring of that year and the projected completion date of the work was set for November, 1973. However, because of problems in

obtaining steel and other work materials, the shell of the building was not entirely completed by June, 1974.

The Mall Group originally intended to construct only the outer shell of the building. Once the shell was completed, the Mall Group would solicit tenants and then arrange the interior to tenants' specifications. It was hoped that the tenants would be putting in their own leasehold improvements (interior walls, plumbing, electricity and sheet metal work) thus saving the Mall Group the expense of these improvements. However, as the project progressed, it became clear that the Mall Group would have to pay for a substantial portion of the interior improvements in order to rent the space to retail tenants.

In the spring of 1974, the Mall Group put the property up for sale in order to raise the funds necessary to complete the project. The property was listed with Munz Investment Real Estate, Inc. (Munz). It was shortly after this listing that Harris became interested in the project.

Harris was the owner of forty-two apartments in Janesville. He had contacted Munz about the possibility of arranging to exchange his apartments as a down payment for other real estate. He wanted to exchange his apartments for other property in order to avoid recognizing any capital gains on the disposal of the property and to get into a real estate venture that did not entail any managerial problems. He also wanted to obtain property which could be used as a "tax shelter" for income he was receiving from a number of hardware stores he owned.

Munz brought the Mall Group and Harris together and an exchange was arranged. The Mall Group sold the building (but not the underlying land) to Harris on a land contract for $1,450,000. As a down payment, Harris exchanged his apartments and added an addition-

al $100,000 in cash ($95,000 of which had been obtained by Harris in a bank loan not at issue in the case). In the land contract, Harris was credited with $324,400 of equity in his apartments. However, $36,300 of that amount was designated to be paid to Munz as a real estate commission on the exchange of the apartments. Thus, the net down payment on the land contract was $388,100 ($288,100 plus $100,000 cash) and the balance financed was $1,061,900. The land contract required Harris to make monthly payments of $9,717.75 to the Mall Group. The Mall Group used Harris' down payment to finish the work on the building.[3] The land contract was executed on June 27, 1974. In addition to the provision set out above, the contract included a buy-back agreement which allowed the Mall Group to repurchase the building from Harris at stated times in the future at fair market value but not for less than $1,580,-000.

On the same date the land contract was executed, the parties executed a lease.[4] The lease provided that the Mall Group would lease the building from Harris for $10,467.45 per month. This payment was $750 per month more than Harris' land contract payment. As part of the lease agreement, each of the individual defendants (Carncross, Dyson, Clark and Borman) executed a guaranty in which they obligated themselves to pay to Harris, upon default by the Mall Group, "the rent or any arrears

---

[3] The Mall Group received Harris' apartments in the tax-free exchange and simultaneously sold them to Munz for $207,200 paid by notes from Munz. The difference between $324,400 (Harris' equity) and the amount of the notes ($207,200) represents the real estate commission owed to Munz by both parties to the transaction. The notes were used to secure the completion of the work until Munz could sell the property and redeem the notes for cash.

[4] Other agreements not pertinent to this review were also executed.

thereof, and all damages that may arise in consequence of any default by the Tenant under such lease . . ."

From July, 1974, to October, 1975, both parties made their payments. However, no payments were made by either party after October, 1975. Although the parties were in regular communication with each other, the first formal written notification of the Mall Group's desire to terminate the lease was not sent until April 23, 1976. The letter included a demand that Harris make efforts to mitigate his damages. On April 29, 1976, Harris refused to accept the termination of the lease but made assurances that he would try to mitigate his damages. Harris then took over responsibility for the mall. He collected the rents from the retail tenants and paid the bills. During this period, he incurred out-of-pocket expenses totalling $19,585.73. On April 26, 1977, the building was damaged by a fire. On June 3, 1977, the building and the underlying land were sold for $700,000 subject to the fire damage. Harris received $50,000 of the amount received from the sale of the property and $100,000 of the fire insurance proceeds.

Harris brought suit to recoup the damages he had suffered because of the breach of the lease.[5] In his Amended Answer and Counterclaim dated March 29, 1979, Harris sought restitution of his investment in the project. That amount, after deductions for the sale and fire insurance proceeds, totalled $238,100.

The case went to trial. At trial, the Mall Group argued that Harris lost money on this project not because of the breach of the lease but rather because he paid too much for his investment. The Mall Group produced Timothy M. Warner, an expert in the appraisal of real estate investments, who testified as to the value of Harris' investment in the project based upon the assumption that Harris had purchased the property solely as a tax shelter.

[5] See Fn. 1.

Warner testified that Harris could have purchased a tax shelter similar to that which this project offered for $159,285 rather than the $388,100 which Harris had actually invested. Judge Bardwell admitted Warner's testimony over the objection of Harris as to its relevancy.

Following trial, Judge Bardwell issued a decision in which he awarded Harris a joint and several judgment against the Mall Group and the individual defendants in the amount of $42,834.[6] In addition to amounts awarded for a lost rental income of $750 per month and for Harris' out-of-pocket expenses, the trial court awarded damages for loss of Harris' investment in the project. However, rather than valuing Harris' investment at the value of the property and cash Harris contributed as a down payment on the land contract, the trial court determined the value of the investment as $159,000—the amount of money which Timothy Warner testified that it would have cost Harris to purchase an equivalent tax shelter investment. Because Harris had already received $150,000 in sale and fire insurance proceeds, the trial court awarded Harris $9,000 for the diminution in the value of his investment.

Harris appealed the judgment. The court of appeals affirmed. In its opinion, the court concluded that Harris was seeking recovery of expenditures made in reliance upon the performance of the lease and thus, under 5 Corbin, *Contracts* sec. 1033 (1964), it was proper to consider whether Harris' expenditures were prudent. The court of appeals determined that the trial court could have appropriately found that only an expenditure of $159,000 would have been prudent.

The first issue on review is whether land contract and lease should be construed as one document.

The trial court concluded that the documents should be construed together. This decision is in accord with well-

---

[6] See Fn. 2.

settled principles of law. As this court wrote in *Wipfli v. Bever*, 37 Wis. 2d 324, 326, 155 N.W.2d 71 (1967), "The general rule is that instruments executed at the same time between the same contracting parties in the course of the same transaction will be construed together."

Here, there is no reason to deviate from the application of the general rule. Although neither agreement referred to the other, from the record it is clear that neither agreement would have been executed without the other being executed. This was one transaction and thus the two documents which were involved will be construed as one.

The second issue on review is whether, as a remedy for the breach of a sale-leaseback contract, the injured party can seek the restitution of his investment in the deal.

This is a case of first impression in this state. The usual pattern prior to this case was that a plaintiff would seek rescission of his contract with the defendant and then ask the court to restore him to the position he was in prior to the making of the contract. *See, Seidling v. Unichem, Inc.*, 52 Wis. 2d 552, 191 N.W.2d 205 (1971). Here, however, the plaintiff, Harris, did not rescind the contract after the Mall Group's breach but rather attempted for a short while to mitigate his damages by taking over the operation of the shopping center. It was only later that Harris brought suit seeking restitution of the money that he had invested in the project.

The remedy of restitution is not limited to rescission cases.[7] It is available as an alternative[8] to those remedies

---

[7] D. Dobbs, *Remedies* sec. 4.1 at 222 (1973) (hereinafter cited as Dobbs).

[8] 5 Corbin, *Contracts* sec. 1104, p. 558 (1964); Restatement, *Contracts* (2d) sec. 344 (1981); *Dobbs*, sec. 4.1 at 222; Farns-

which protect an injured party's expectation or reliance interests in a contract.[9] Although a party's choice of remedies may be limited by the fact situation he finds himself in,[10] within such limitations, the choice of remedies is the party's.[11]

Usually a non-defaulting party will seek to recover damages based on expectation rather than a recovery based on his reliance or restitution interests. This is so because it is the objective of the damage remedy to place the injured party in the situation he would have been had the contract been performed.[12] Normally, then, a recovery which protects a party's expectation interest is larger than one which protects either of his other interests.

However, there are situations where a damage recovery based on expectation may not provide the best relief to the injured party. Where profits are uncertain or a losing contract is breached, a damage recovery based on protecting the injured party's expectation interest would result in no recovery for that person. The Restatement recognizes this possibility in noting that "occasionally a party chooses [to protect] the restitution interest even though the contract is enforceable because it will give a larger recovery than will enforcement based on either the expectation or reliance interests."[13]

worth, *Legal Remedies for Breach of Contract*, 70 Colum. LR 1145, 1175 (1970).

[9] For a discussion of the expectation, reliance and restitution remedies see Dobbs sec. 12.1.

[10] For example, in order to recover damages and protect one's expectation interest in a contract, it is necessary to prove anticipated profits to a reasonable degree of certainty. Dobbs, *Remedies* sec. 3.3 at 153 and sec. 12.3 at 807; Corbin, sec. 1022.

[11] Restatement, sec. 373 comment a.

[12] Dawson, *Restitution or Damages?*, 20 Ohio St. L.J. 175, 185 (1959).

[13] Restatement, sec. 344 comment d.

We conclude that Harris had available to him the option of seeking restitution of his investment in the project.

In order for a person to obtain a restitution recovery, there are a number of requirements which must be met. First, the breach involved must be a "total breach."[14] A total breach is one which "is of such vital importance and so material that it is held to go to the 'essence' of the contract." *United States v. Western Casualty & Surety Co.*, 498 F.2d 335, 339 (9th Cir. 1974). The second requirement is that the injured party has not performed all of his duties under the contract so all that remains is to have the breaching party pay a definite sum of money.[15] Finally, for an injured party to be entitled to restitution, he must have conferred a benefit on the other party by way of part performance or reliance.[16]

In the instant case, the Mall Group's breach of its lease resulted in the failure of the entire sale-leaseback transaction. Although as one of the individual defendants testified at trial, it is undoubtedly true that a downturn in the economy played a large role in the failure of this project; it is also true that had the lease payments been continued Harris would still be enjoying the benefits of the contract. Harris purchased a shopping

[14] *Id.* Section 373 comment a.

[15] *Id.* Section 373(2).

[16] *Id.* Section 370. This final requirement used to be phrased in terms of the other party having been "unjustly enriched" by the injured party's actions. However, this language led to confusion as to the availability of restitution as a remedy. The new Restatement grounds its operative rules primarily on the concept of "receipt of a benefit" and thus "allows recovery for benefits conferred whether or not the defendant has been enriched in estate." Perillo, *Restitution in the Second Restatement of Contracts*, 81 Colum. L.R. 37, 38 (1981).

center which was leased back to the sellers for $750 per month more than Harris owed in land contract payments.[17] By this arrangement, Harris could obtain the benefits of ownership without ever having to assume management responsibility for the facility. When the Mall Group breached, Harris not only became unable to make his land contract payments but he also had to assume management of the shopping center. In addition, instead of receiving $750 per month in income, Harris began to have to pay out-of-pocket expenses to keep the project alive. There is no doubt that the Mall Group's breach here went to the essence of the contract.[18]

The second requirement is that the injured party cannot have performed all of his duties under the agreement so all that remains is to have the breaching party pay a definite sum of money. Here, Harris did not perform all of his duties under the contract. He was required to lease the shopping center to the Mall Group for another twenty-five years after the breach occurred. He was also required to make payments on the land contract. Therefore this requirement is satisfied.

Finally, restitution is allowed only to the extent the injured party has conferred a benefit on the other party. Here Harris made a down payment on the land contract of $388,100. This money went directly to the Mall Group. The Mall Group used the money to complete the shopping center project and to pay real estate com-

[17] Although $750 per month approximated the monthly interest due on a $95,000 loan Harris had taken out to come up with the cash down payment on the land contract, there was no requirement in the agreement that the money be used to pay that interest.

[18] It should be noted that even though there was a total breach of the contract, it was not necessary for Harris to seek judicial remedy at once or to choose immediately from among the remedies that were conceivably available to him. Corbin sec. 1104 at 565 and sec. 1105 at 569.

missions it owed.[19] While it may initially appear that the Mall Group did not receive the full benefit of the money Harris paid because some of it went back into the building, a careful review of the facts suggests otherwise.

The Mall Group was required to make regular lease payments to Harris of over $9,000 per month. In order to lease the premises to retail tenants, the Mall Group needed to have the interior work completed. In fact, the need to raise money to complete the interior work on the building was the reason the Mall Group first went looking for a buyer for the building. Consequently, for the Mall Group to make enough money from retail tenants to make its lease payments to Harris, the interior work had to be completed. In this manner the money Harris put down on the land contract benefited the Mall Group.

The Mall Group also received benefit from the down payment in that it held an option to repurchase the shopping center building at specified future dates. The Mall Group, by exercising its option, could have directly received the money which Harris had put down on the land contract.

Harris paid $388,100 to the Mall Group as a down payment. He received 150,000 in sale and fire insurance proceeds. He is entitled to restitution of $238,100 which is the net amount of money he invested in the project. Restatement (Second) of Contracts, sec. 371 Comment a.

The Mall Group argues that the restitution remedy is improper here because sec. 704.29, Stats. 1975,[20] limits

---

[19] As part of the agreement, the Mall Group obligated itself to pay the real estate commission on the entire transaction.

[20] Section 704.29 (1), Stats. 1977:

"704.29   **Recovery of rent and damages by landlord; mitigation.** (1)   SCOPE OF SECTION. If a tenant unjustifiably removes from

Harris to a recovery of rent and out-of-pocket expenses. However, that section expressly applies to the "liability of a tenant under a lease" and we have already determined that it is more than just a lease we are considering here. It is the Mall Group's liability under the sale-leaseback contract that is at issue here and sec. 704.29 (1) is inapplicable.

The Mall Group also urges this court to consider the tax benefits which resulted to Harris because of his ownership of the property in order to determine what recovery is properly due Harris. However, a restitution recovery is measured by the benefit conferred on the other party. The fact that Harris may have received tax benefits because of his property ownership does not diminish the size of the downpayment the Mall Group received. We therefore conclude that in this case Harris' restitution recovery should not be reduced by the tax advantages he has enjoyed.[21]

In addition to the recovery of his $238,100 investment in the contract, Harris is entitled to receive his out-of-pocket expenses of $19,584. *Head & Seemann, Inc. v. Gregg*, 107 Wis. 2d 126, 127, 318 N.W.2d 381 (1982)

the premises prior to the effective date for termination of his tenancy and defaults in payment of rent, or if the tenant is removed for failure to pay rent or any other breach of a lease, the landlord can recover rent and damages except amounts which he could mitigate in accordance with this section, unless he has expressly agreed to accept a surrender of the premises and end the tenant's liability. Except as the context may indicate otherwise, this section applies to the liability of a tenant under a lease, a periodic tenant, or an assignee of either."

[21] We are cognizant of recent decisions in security fraud cases involving tax shelters where damages have been reduced by the amount of tax benefits the investors received. *See, Austin v. Loftsgaarden*, 675 F.2d 168 (8th Cir. 1982). However, not all jurisdictions which have considered this question agree with this position. Banoff, *To What Extent Will Benefits From Tax Shel-*

adopting as the court's opinion 104 Wis. 2d 156, 167, 311 N.W. 667 (Ct. App. 1981). In *Head & Seemann,* in addition to a restitution recovery and an award for out-of-pocket expenses, recovery was also allowed for the reasonable rental value of property which was occupied by a fraudulent land contract purchaser. This latter recovery was justified on the theory that the rental value of the property represented a benefit which flowed directly from the injured party to the other party. 107 Wis. 2d at 127. Here however, after the breach of the agreement, Harris essentially took over management responsibility for the building and the Mall Group no longer enjoyed any benefit of its lease of the building. Since soon after the breach Harris obtained a measure of control over the property, allowing him a recovery of his rental income in addition to the restitution of his investment in the project would constitute a double recovery. As the Court noted in *Head & Seemann,* recovery of out-of-pocket expenses may be had "as long as they not constitute a double recovery. . . ." 107 Wis. 2d at 127. We conclude the same rule should apply to recovery of the lost rental income here and recovery of this amount should not be allowed.

The final issue is whether the guaranty here makes the individual defendants liable as guarantors for the restitution of Harris' investment in the contract and for his out-of-pocket expenses.

---

*ters Be Permitted To Offset Rescission Damages?* 57 Jrnl. Tax. 154, 157, Exhibit I, fn. 7, 8. Here, while tax benefits were received and there clearly was some purpose to use the shopping center as a tax shelter, the record shows that Harris did not enter into this transaction solely because of its tax shelter aspect. Consequently, we conclude that this case is not appropriate to determine if tax benefits received should be considered in order to reduce the size of a damage award or restitution recovery.

The defendants do not challenge the guaranty as such but rather argue that the individuals guaranteed only the Mall Group's obligations under the lease. We have already concluded that the lease and land contract must be read as one agreement because they were executed as part of the same transaction. Consequently, the guaranty, which was made part of the lease, must be read within the context as the sale-leaseback agreement.

The trial court did not make any findings on the question of the extent of the individual defendants' liability under the guaranty. The trial court stated that "the individual defendants here only guaranteed lease payments . . ." but held the individual defendants' and the Mall Group joint and severally liable for a judgment which included two items of damages (out-of-pocket expenses and diminution of investment) totalling $27,-584 which did not directly involve the lease payments. The court of appeals affirmed the judgment without a discussion of the individual defendants' liability under the guaranty.

The determination of whether an instrument is intended to be a guaranty is one of fact. *Klein-Dickert Oshkosh v. Frontier Mortgage Corp.*, 93 Wis. 2d 660, 668, 287 N.W.2d 742 (1980). Here, however, it is not in dispute that the instrument is a guaranty. Rather, it is the construction of the language of the guarantee that is in question.

A guaranty is a contract. *Klein-Dickert*, 93 Wis. 2d at 659. The rules governing the construction of contracts apply.

Construction of a written agreement is a matter of law for the Court where the agreement is unambiguous. *Stradinger v. City of Whitewater*, 89 Wis. 2d 19, 31, 277 N.W.2d 827 (1979). Where the construction is a

question of law, it may be redetermined by this court on appeal. 89 Wis. 2d at 31.

Here the guaranty expressly obligated the guarantors to pay Harris "all damages that may arise in consequence of any default by the Tenant under such lease." The plain meaning of this guaranty obligates the individual defendants to pay for all damages resulting from the breach of the lease.

Although the term "damages" is used in the guaranty, this does not prevent Harris from recovering his investment in the project and his out-of-pocket expenses although the recovery is based on a restitution theory. Words in a contract are generally given their plain and ordinary meaning. *North Gate Corp. v. National Food Stores*, 30 Wis. 2d 317, 321, 140 N.W.2d 744 (1966). In *Fee v. Heritage Mutual Ins. Co.*, 17 Wis. 2d 364, 366, 117 N.W.2d 269 (1962), this court defined the word damages as meaning "A pecuniary compensation or indemnity, which may be recovered in the courts by any person who has suffered loss, detriment, or injury, whether to his person, property or rights, through the unlawful act or omission . . . of another." (citing Black's Law Dictionary 466 (4th ed. 1968). As so defined, the use of the word "damages" in the guaranty does not limit the guarantors' liability only to actions seeking to protect Harris' expectation interest in the contract. Further, there is nothing in the guaranty showing an intent by the parties to limit the guarantors' liability to an action for expectation damages rather than an action for restitution.

We conclude the individual defendants are liable as guarantors to make restitution of Harris' investment in the project and for Harris' out-of-pocket expenses.

The trial court's damage award included interest at the legal rate (five percent) running from the date of

the sale of the building to the date of the judgment. This award is not disputed and we do not address its propriety here. In addition, Harris seeks twelve percent interest on any revised award from the date of the original judgment to the date the judgment is paid.

This court held in *Jones v. Jenkins,* 88 Wis. 2d 712, 727, 277 N.W.2d 815 (1979), that the interest rate set out in sec. 815.05(8), Stats.[22] and sec. 814.04(4)[23] is the interest rate to be paid from the date of verdict until the date payment is made. In Chapter 271, Laws of 1979, the legislature increased the interest rate in those sections from seven percent per annum to twelve percent per annum. However, under sec. 5 of that chapter, the new interest rate was made applicable only to actions commenced on or after the effective date of the act (May 11, 1980).

Here the action was commenced on January 14, 1977 and Harris' counterclaim was filed on February 28, 1977. Therefore the interest rate applicable to any award resulting from this action is seven percent per annum. Because an award of post-judgment interest is made for the purpose of compensating the injured party to whom payment is due for the loss of use of the money, *Estreen v. Bluhm,* 79 Wis. 2d 142, 156, 255 N.W.

---

[22] Section 815.05(8), Stats. 1977:

"815.05 **Execution, how issued; contents.** . . .

"(8) Every execution upon a judgment for the recovery of money shall direct the collection of interest at the rate of 7% per annum on the amount recovered from the date of the entry thereof until paid."

[23] Section 814.04(4), Stats. 1977:

"814.04 **Items of costs.** Except as provided in s. 814.025, when allowed costs shall be as follows: . . .

"(4) INTEREST ON VERDICT. When the judgment is for the recovery of money, interest at the rate of 7% per annum from the time of verdict, decision or report until judgment is entered shall be computed by the clerk and added to the costs."

2d 473 (1977), we conclude that interest on the revised award should commence to run from July 28, 1981, the date of entry of the trial court's judgment.[24]

*By the Court.*—Decision of the court of appeals reversed and cause remanded to the trial court with directions to enter judgment for the plaintiff in the amount of $257,684 with interest at the rate of seven percent per annum from date of original judgment.

SHIRLEY S. ABRAHAMSON, J. (*dissenting*). The majority holds that the two agreements should be construed together because "it is clear that neither agreement would have been executed without the other being executed." (*Supra,* p. 496.) I agree with this conclusion.

I am not convinced that restitution is the proper measure of recovery in this case. Even if it is, however, I do not agree with the majority's computation of Harris' award. Restitution is a broad equitable remedy and restitutional damages depend upon the facts of the particular case. Perillo, *Restitution in a Contractual Context,* 73 Colum. L. Rev. 1208 (1973) ; Calamari and Perillo, *Contracts,* ch. 15 (2d ed. 1977) ; Dobbs, *Law of Remedies,* sec. 4.1 p. 227, sec. 4.5 pp. 268–69 (1973). In this case the court should, in assessing damages, consider restoring the plaintiff to his original position. I therefore would remand the case to the trial court to consider whether Harris' recovery as calculated by the majority should be reduced by Harris' tax benefits, if any. *See* Brodsky, *Tax Shelter Litigation: Damage Calculations,* 184 New York L.J. (Sept. 3, 1980, p. 1; Sept. 4, 1980, p. 1; Sept. 5, 1980, p. 3), and cases cited therein and in the majority opinion.

---

[24] For jurisdictions allowing the award of interest in this circumstance, *see* Annot., *Date From Which Interest On Judgment Starts Running, As Affected By Modification Of The Amount On Appeal,* 4 ALR3d 1221, 1234.

WILLIAM G. CALLOW, J. (*dissenting*). The majority incorrectly concludes "that the guaranty executed here obligates the individuals as guarantors to pay for the restitution of the injured party's investment." *Supra* at 521. In this case knowledgeable investors, counseled by attorneys and accountants under the auspices of Munz Investment Real Estate, Inc., negotiated the disposition of forty-two apartments in Janesville and a shopping mall in Monona. Harris wanted to dispose of his apartments but wanted to avoid the capital gains tax. By trading his apartments for the mall, he avoided the tax which would have resulted from a sale for cash and obtained a "tax shelter" for income he received from his hardware stores.

The mall owners needed cash to complete the construction. The Mall Group and Harris each listed their properties with Munz. Munz brought the parties together and received a commission of over $100,000 from the deal. The transaction included two separate documents—a sale contract and a lease agreement. The trial court properly recognized "[t]he sole issue in this case is what are the plaintiff's provable damages resulting directly from the breach of the lease by the Mall." The trial court, relying on *First Wisconsin Trust Co. v. L. Wiemann Co.*, 93 Wis. 2d 258, 286 N.W.2d 360 (1980), limited the damages to losses incurred between November 1, 1975, and the date of the sale of the property, June 3, 1977.

Certainly the record supports the trial court's conclusion that the members of the Mall Group suffered a loss of over $400,000, and Harris lost a substantial portion of the value of his apartments. Acknowledging that both parties suffered major losses in the venture, the majority concludes Harris shall be made whole at the expense of the mall investors.

The majority concludes that the sale contract and the lease agreement should be construed together. Constru-

ing documents together is appropriate to interpret the general intent of the parties. However, unless the documents incorporate each other by reference, it is inappropriate to construe them together for purposes of their operation and effect. In this case the sale contract and lease agreement cannot be construed as one document. No clause in either document referred to the other. The attorney for the Mall Group prepared the sale contract, and the attorney for Harris prepared the lease. The personal guaranty of the lease by defendants Borman, Dyson, Clark, and Carncross provided for "the payment of rent or in the performance of any other covenants contained in such lease, . . . and all damages that may arise in consequence of any default by the Tenant under such lease." The guaranty, by its terms, does not apply to the sale contract.

There is no language in the sale contract referring to the lease. Harris testified the completed building was worth the price he paid. Therefore, I conclude it is unreasonable to read the guaranty of rents and damages in the lease, incident to the failure of the general tenant (the mall) to pay rent, to be a guarantee that the purchase of the mall would be a successful investment for Harris. The trial court found "that the individual defendants here only guaranteed lease payments and not the success of the entire transaction." The trial court noted that, under sec. 704.29(1), Stats. 1977, Harris was obligated to enter and take possession for the purpose of mitigating damages. Harris did take possession, and the trial court assessed his effort to mitigate the damages. The trial court stated, "[t]he evidence elicited at the trial bearing on the plaintiff's efforts to mitigate damages is somewhat meager." In order to recover on the guaranty, Harris was obligated to offer substantial evidence that he had mitigated damages.

The trial court noted that in 1976 Harris could have settled all liens against the property for $600,000 and

in 1977 could have sold the premises for $911,000 but did not avail himself of that opportunity. Such a course of action could have produced an "apparent net gain of in excess of $300,000.00," stated the trial court. The trial court inferred that Harris had sufficient financial means to have put such a deal together. The trial court noted that Harris had failed to make his payments to the mall and called it a "two-way" breach. It was during this period of "two-way breach" that Harris refused the $911,000 sale opportunity. The trial court concluded its findings by saying: "It is obvious the plaintiff bought into a very bad business situation, and he had to assume some of the risks of that venture; and it should not be overlooked that Mr. Harris breached his own purchase contract without, in our judgment, making all reasonable attempts to mitigate his damages." This conclusion most certainly is not against the great weight and clear preponderance of the evidence. It clearly justifies the trial court's limiting the award of damages to the out-of-pocket disbursements and the total amount flowing to Harris from the failure of the Mall Group to pay the $750 per month for nineteen months.

The majority acknowledges that the issue of Harris' option of seeking restitution of his investment in the project is one of first impression in this state. The majority concludes that option is available to Harris. I disagree. The majority incorrectly construes the contract of sale and the lease as one agreement. Harris did not terminate or rescind the lease or the contract of sale. He agreed to accept the leased property and mitigate damages. He chose to sue on the lease and to recover damages under the statute. Harris never claimed to have rescinded the sale contract, and understandably so because rescission is not the remedy for breach of a lease. Rescission is allowed only where there has been a substantial breach of contract. Here, the defendants breached the terms of the lease agreement, and Harris

breached the terms of the sale contract. Harris does not come into this lawsuit with clean hands.

In *Appleton State Bank v. Lee,* 33 Wis. 2d 690, 692, 148 N.W.2d 1 (1967), this court stated:

"In order to establish a breach sufficient to constitute repudiation of the entire agreement the nonperformance or breach must be substantial.

" '. . . a breach which goes to only a part of the consideration, which is incidental and subordinate to the main purpose of the contract, and which may be compensated in damages, does not warrant a rescission of the contract; . . .'

"*Before a party not in default* may be entitled to the relief of rescission there must be so serious a breach of the contract by the other party as to destroy the essential objects of the contract." (Citation omitted.) (Emphasis added.)

The lease which was breached was only one element of the total transaction and produced only $750 per month cash flow to Harris. Harris bought a substantial piece of property acquiring a lease with a general tenant. The general tenant occupied no space. The Mall Group had some individual rent-paying tenants and space available for rent. Harris bought it for what he thought to be a fair value. It permitted him to defer capital gains and provide a tax shelter which he said were primary motives for the purchase. He had a defaulting general tenant but had the opportunity to collect rents from the occupying tenants. His remedy was limited to reimbursement for damages incident to the default in payment by his general tenant. This would be the amount representing the difference between the rent Harris collected from the individual tenants and the amount he was to receive from the general tenant. He insured his ability to recover potential damages resulting from default in rent payments by the guaranty.

An election to seek restitution requires a tender of benefits. Harris received what he bargained for in his purchase contract—which was a fair-priced building and substantial tax benefits. Restitution requires the return of benefits received restoring the parties to the position they occupied prior to entering into the contract. Rescission is, therefore, not appropriate where the rescinding party (Harris) received substantial tax benefits. *Bridgen v. Scott,* 456 F. Supp. 1048, 1058 (S.D. Texas 1978). In *Bridgen* the court recognized benefits which prohibit rescission, such as immediate tax write-off, immediate cash flow profit, the potential for further annual tax benefits, and the opportunity to obtain significant gains. These same elements exist in this case. The tax consequences were crucial. The *Bridgen* court stated that to ignore the tax consequences would require the court to live in a "never-never land." It would be asking the court to try the case blindfolded. *Id.* at 1061.

Professors Corbin and Dobbs declare that restitution is designed to prevent unjust enrichment. 5 A. Corbin, *Contracts* sec. 1107 (1964) ; D. Dobbs, *Handbook on the Law of Remedies* sec. 4.1 at 224 (Hornbook Series 1973). The majority labors to find the defendants were enriched, but the record repudiates that conclusion and supports the trial court's determination that the defendants "apparently lost in excess of $400,000." The fact that there was a repurchase option agreement and that defendants used the Harris money to finish the mall for Harris is gossamer support for a conclusion that the defendants were enriched.

The majority opinion unjustly enriches Harris. The majority returns to Harris his entire investment of $388,100 and ignores his substantial tax advantages. This includes $288,100 for the apartments. It ignores the trial court's conclusion that his property was overvalued. The trial court stated as follows: "One of the

problems in this case arises out of the fact that in our judgment the parties over valued . . . the value of plaintiff's equity in his apartment units." The court concluded, "the best evidence of the value of plaintiff's equity is the amount that Munz received when it sold the apartments, approximately $207,000.00."

Because the majority reads the two instruments—the sale contract and the lease agreement—as one, the majority concludes the guaranty provision in the lease must be read to guarantee Harris's investment in the project. This conclusion is reached by declaring there is nothing in the guaranty showing an intent by the parties to limit the guarantors' liability to an action for expectation damages rather than an action for restitution. The unreasonable result proves the fallacy of the majority's original premise that the two instruments must be read as one.

Had the parties contemplated a guaranty of Harris's investment, it would certainly have been noted in the contract of sale or reference to the lease guaranty would have been included. In the absence of specific guaranty language and in the light of the statutes dealing with liability on breach of lease, the conclusion of the majority is incredible. Harris did not present the reliance damages theory in the trial court nor in the appellate court, but the appellate court considered the theory of reliance damages and observed that expenditures made in reliance upon the other party's performance must be prudent and reasonable. Harris argues the testimony showing his investment's true value was irrelevant. The court of appeals correctly concluded it was relevant evidence in determining damages, relying on 5 A. Corbin, *Contracts* sec. 1033 at 206 (1964) :

"[I]t becomes material to know whether the expenditures of the plaintiff in preparation and part performance have been prudent and reasonable, or not. The

plaintiff has the burden of proving his entire cause of action and also of proving the amount of damages to which he has a right. If he is unable to prove the pecuniary position in which he would have been put by full performance and is asking to recover as damages the amount of his expenditures in part performance, he should at least be required to establish a probability that such a judgment will not be excessive compensation. Expenditures by a contractor that are improvident and unreasonable lead to net losses, rather than to profits; and so long as it is uncertain which would have been the result of such improvident expenditures, they are not included in damages."

The trial court relied on and the court of appeals noted with approval the testimony of Timothy Warner, a real estate investment expert. The appellate court correctly affirmed the trial court's conclusion that Harris's investment was improvident. It was not contrary to the great weight and clear preponderance of the evidence.

In summary, I disagree with the majority's conclusions that the lease agreement and the sale contract be read as one instrument; that a breach of a lease in a real estate transaction involving a sale and a leaseback justifies an action for restitution of the investment in the project; that a guaranty clause in the lease can be extended to hold the guarantors liable for the restitution of Harris's investment in the contract.

I would modify and affirm the court of appeals by limiting the recovery to only those damages proved. Those damages are $19,584 out-of-pocket expenses and $14,250 which represents $750 for 19 months' loss of the proven net cash flow, plus interest.

I am authorized to state that JUSTICE DONALD W. STEINMETZ joins in this dissenting opinion.