In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 01-2230, 01-2360, 01-3600

CSC HOLDINGS, INC.,

*Plaintiff-Appellee,*

*v.*

FRANK P. REDISI, SR.,
and FRANK P. REDISI, JR.,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 3516—**Ruben Castillo**, *Judge.*

ARGUED FEBRUARY 11, 2002—DECIDED OCTOBER 29, 2002

Before RIPPLE, DIANE P. WOOD, and WILLIAMS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* For over a decade, Frank Redisi, Sr. and his son, Frank Redisi, Jr., operated a variety of business entities in the Chicago suburbs that manufactured cable television decoders, which allow one to view all of a cable provider's scrambled premium or pay-per-view programming free of charge. From 1992 to 1999, the Redisis sold thousands of decoders to customers of the plaintiff CSC Holdings, Inc., which refers to itself as Cablevision here. In May 1999, Cablevision brought suit for violations of the Cable Communications Policy Act of 1984, 47 U.S.C. § 553, and secured a temporary restraining

order and asset freeze against the Redisis and their businesses. The district court found against the Redisis on summary judgment and after a damages trial awarded Cablevision over $29 million. On appeal, the Redisis assert a statute of limitations defense and also contest numerous discovery rulings and the district court's damages determination. We reverse and remand for further proceedings.

**I**

The Redisis began selling their illegal wares sometime before 1990, initially operating under the name of Teleview Distributors, Inc. By January 1991, FBI agents were investigating the Redisis' activities and meeting with leaders of the cable television industry, including Robert Astarita, Cablevision's Senior Vice-President of Corporate Security, to discuss the problem of cable theft. At one point in 1991, Astarita sent Teleview Distributors a letter indicating that he had evidence that some of the products Teleview Distributors was selling might be capable of descrambling Cablevision's signal and that, if so, it should cease and desist immediately. The Redisis failed to respond to the letter.

On November 4, 1992, the FBI served a search warrant on Teleview Distributors, obtaining substantial evidence of wrongdoing and shutting down the business. As a direct result, Redisi, Jr. pleaded guilty to one count of violating 47 U.S.C. § 553. The FBI kept Astarita apprised of its progress in fighting cable theft through at least 1995; in particular, it gave him updates on the investigation and the criminal charging of Redisi, Jr.

Cablevision claims that after November 1992, it believed that the Redisis had turned from their life of crime, but this proved not to be the case. They very quickly resumed operations and later incorporated as Omega Hold-

ings (owned by the Redisis) and Omega of Elgin (owned by Redisi, Sr.) and shared facilities, equipment, and inventory with various other companies selling decoders (owned by defendants who have settled out of the case). Between November 1992 and May 1999, the Redisis through various corporate identities and affiliates sold 2,756 decoders to probable Cablevision customers.

Cablevision began a serious investigation of the Redisis in March 1998, in the course of which it made six undercover purchases of decoders that descrambled all of its programming over the course of the next year. On May 26, 1999, Cablevision filed a motion for a temporary restraining order and asset freeze and sought monetary and injunctive relief. The district court enjoined the Redisis from selling any decoders, froze the Redisis' personal and corporate assets, and directed the U.S. Marshal to seize business records and computers.

When the Redisis appeared in court, they moved unsuccessfully to have the action dismissed. The district court instead granted a preliminary injunction on June 24 and set a briefing schedule under which discovery was to close on September 10. The defendants served written discovery requests on the plaintiffs in July but did not notice any depositions at that time. Cablevision moved for summary judgment on July 29.

On Friday, August 27, the Redisis' attorney noticed depositions for five Cablevision employees to be conducted on the first three days of September. Astarita was scheduled to be deposed on the morning of September 2, six days after the notice was sent. Cablevision informed the Redisis that it would produce four of the employees but would not produce Astarita, representing that he had no knowledge of events relating to the case that could not be gained from the other four witnesses. The district court then denied the Redisis' motion to compel Astarita's

deposition, finding that the Redisis had produced no evidence of relevance and that the expedited discovery request would be unduly burdensome to Astarita.

On Friday, September 3, one week before the close of discovery, the Redisis again noticed a deposition for Astarita. Cablevision refused to comply with this notice, and the Redisis then sought reconsideration of their original motion to compel. They produced affidavits from FBI agents indicating that Astarita, and thus Cablevision, knew of the Redisis' actions as early as 1991 and had engaged in extensive discussions with the FBI between 1993 and 1995. They further represented that this fact was important to their statute of limitations defense. The district court denied this motion as well on the ground that the deposition was "not relevant." In December 1999, it granted Cablevision's motion for summary judgment as to liability in its entirety, rejecting the Redisis' statute of limitations defense.

Damages discovery led to a repeat of many of the disputes from the liability phase. After deposing Joseph Flaim, Cablevision's principal damages witness, the Redisis moved to bar Flaim's damages analysis (on the ground that it was based on undisclosed materials) and requested an extension of discovery. The district court denied both motions but did order Cablevision to provide the Redisis with a summary of its damages calculations and supporting materials other than its customer lists. Flaim testified as to his damages analysis at trial, which the district court in large part accepted. The court then awarded Cablevision almost $29.8 million in damages, plus $300,000 in costs and attorneys' fees.

## II

The parties agree that the relevant statute of limitations is found at 47 U.S.C. § 415(a), which provides, "All

actions at law by carriers for recovery of their lawful charges, or any part thereof, shall be begun, within two years from the time the cause of action accrues, and not after." The Redisis do not seriously dispute that they have violated the law, but they argue that the statute of limitations bars Cablevision's suit because Cablevision knew of its injuries more than two years before it filed suit in May 1999.

In the first place, it should be noted that the Redisis made a number of decoder sales to Cablevision customers during the two years preceding the commencement of this action. Under any theory of the case, Cablevision filed a timely claim as to those sales, as the Redisis' counsel conceded at oral argument. But at least on the face of the statute, Cablevision's claims as to 90% or so of the decoders sold would be barred if the Redisis' statute of limitations argument is correct. Cablevision offers two reasons why it should still be permitted to prosecute its claim in its entirety: (1) the Redisis' actions amounted to a continuing violation; and (2) the statute of limitations was tolled because Cablevision did not know or have reason to know of the Redisis' violations.

"[T]he statute of limitations does not begin to run on a continuing wrong till the wrong is over and done with. . . ." *Taylor v. Meirick*, 712 F.2d 1112, 1118 (7th Cir. 1983). This is a general legal principle, just as applicable to Title VII and Section 1983 cases as it is to copyright violations or business torts. *Heard v. Sheahan*, 253 F.3d 316, 319-20 (7th Cir. 2001). A continuing violation exists "where it would be unreasonable to require or even permit [a plaintiff] to sue separately over every incident of the defendant's unlawful conduct." *Id.* at 319.

The Supreme Court recently clarified the nature of continuing violations in *National R.R. Passenger Corp. v. Morgan*, 122 S. Ct. 2061 (2002). In *Morgan*, the Court ruled

that a Title VII plaintiff could not recover for "discrete discriminatory acts" that occurred outside the relevant EEOC filing deadlines but could recover for such actions on a hostile work environment theory. *Id.* at 2071-73. We too have noted the contrast between a continuing wrong, such as deliberate indifference to a prisoner's medical treatment, and discrete acts, such as consistently underpaying an employee because of her sex. *Heard*, 253 F.3d at 320.

The wrong alleged here is the Redisis' "distribution of equipment intended . . . for unauthorized reception of any communications service offered over a cable system. . . ." 47 U.S.C. § 553(a)(2). While Cablevision contends that the Redisis' action was continuing because of their continued sales made over a seven-year span, this belies the actual nature of the claim. The Redisis sold over 2,700 decoders. Each of those sales was a separate and discrete statutory violation for which Cablevision could recover. The mere fact that the Redisis made a regular habit of violating the statute is not enough to convert multiple individual violations into one long continuing wrong. For criminal penalties, the statute expressly declares that the distribution of each individual device "shall be deemed a separate violation." 47 U.S.C. § 553(b)(3). Because each of the Redisis' decoder sales is a separate violation, the continuing violation doctrine has no application here.

Statutes of limitations are of course subject to equitable doctrines such as tolling, and the modern tendency is to toll until the plaintiff knew or by reasonable diligence should have known of both the injury and its governing cause. *Fries v. Chicago & Northwestern Transp. Co.*, 909 F.2d 1092, 1095 (7th Cir. 1990). An abstract fear of wrongdoing is not enough. *Sokol Crystal Prods., Inc. v. DSC Communications Corp.*, 15 F.3d 1427, 1430 (7th Cir. 1994). Nonetheless, the statute begins to run once a plaintiff has knowledge which would lead a reasonable person to

investigate the possibility that her legal rights had been infringed. *LaSalle v. Medco Research, Inc.*, 54 F.3d 443, 446 (7th Cir. 1995). The Redisis argued below that Cablevision knew or should have known of their actions as early as 1991 and certainly no later than 1995, but the district court rejected this position, instead finding that nothing in the record would have put Cablevision on notice of the defendants' actions until it began its investigation in 1998.

The Redisis point to a variety of information that Cablevision had at its disposal prior to 1995, including advertisements of their illegal wares placed in national magazines, cease and desist letters sent to them by Cablevision's own Senior Vice-President Astarita, and affidavits from FBI agents and another cable television executive indicating that the FBI communicated several times with Astarita about its "Operation Cable Trap" investigation of decoder sellers including the Redisis. At one such meeting in 1995, the agents specifically noted that Redisi, Jr. and Teleview were advertising nation-wide sales of decoders.

The briefs of both parties make abundantly clear that the key issues in this case are how much Astarita knew about the Redisis' activities and when he knew it. When did Astarita first see the Redisis' advertisements? What did Astarita learn from the FBI meetings? What caused him to launch his investigation in March 1998?

Despite the critical importance of Astarita to the case, the district court refused to allow the Redisis to depose Astarita, finding that his testimony would not be relevant to any issue in the case. A party has a general right to compel any person to appear at a deposition, through issuance of a subpoena if necessary. FED. R. CIV. P. 30(a). A district court may quash or modify a subpoena if it fails to allow a reasonable time for compliance or subjects

the deponent to an undue burden. FED. R. CIV. P.
45(c)(3)(A). When a district court considers a motion to
compel, it must evaluate such factors as timeliness, good
cause, utility, and materiality. *Farmer v. Brennan*, 81 F.3d
1444, 1449 (7th Cir. 1996). We will overturn a decision
limiting discovery only if: "(1) the record contains no
evidence upon which the court could have rationally based
its decision; (2) the decision is based on an erroneous
conclusion of law; (3) the decision is based on clearly er-
roneous factual findings; or (4) the decision clearly ap-
pears arbitrary." *Stagman v. Ryan*, 176 F.3d 986, 993-94
(7th Cir. 1999) (citing *Gile v. United Airlines, Inc.*, 95 F.3d
492, 495 (7th Cir. 1996)).

The sole ground the district court offered for its denial of
the Redisis' motion to depose Astarita was that his testi-
mony would not be relevant. It is true that a district
court may deny motions to compel depositions that would
not aid in "the exploration of a material issue." *Israel
Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*,
61 F.3d 1250, 1254 (7th Cir. 1995). In this case, however, it
is plain that Astarita's deposition would have assisted
in exploring the material issue of whether the Redisis
had a valid statute of limitations defense to the bulk
of Cablevision's claim. The district court's determination
that the motion to compel was "not relevant" was based,
as far as the record shows, only on Cablevision's bare
representation that Astarita knew nothing about the
case and that four other deposed Cablevision employees
knew as much as he did. This is not enough to establish
an undue burden under Rule 45 or to show some other
exceptional circumstance that would justify prohibiting
the deposition altogether. See *Kaier v. Mutual Life Ins.
Co.*, 161 F.R.D. 378, 380 (S.D. Ind. 1994). In any event, the
record proves that Astarita's deposition was highly rele-
vant. The Redisis presented in their motions evidence
that none of the individuals Cablevision produced had

been with the company for more than 14 months, while Astarita had worked there for close to a decade. As director of corporate security with responsibility for cable theft investigations, he alone could provide the answer to the relevant question of whether Cablevision had knowledge sufficient to trigger a duty to investigate more than 24 months before it brought suit. Although discovery rulings are subject to the usual harmless error analysis, see FED. R. CIV. P. 61, we cannot find this ruling to be harmless. To the contrary, it went to the heart of the Redisis' defense. Therefore, we must reverse the judgment of the district court and remand with instructions to grant the motion to compel Astarita's deposition.

The Redisis ask us to go further and hold that on the record before us it was objectively unreasonable for Cablevision not to have investigated their activities sooner than it did. We decline to take this step. After reviewing Astarita's deposition and any other additional facts the parties can adduce on remand, the district court will be in the best position to determine whether Astarita or anyone else at Cablevision reasonably should have investigated sooner or whether the information at his disposal was so limited as to toll the statute of limitations.

### III

Even in a best-case scenario for the Redisis, we agree with the district court that they are liable for sales within the two-year period of limitations. That means at a minimum that they must account for their post-May 1997 sales of illegal decoders. We therefore find it appropriate to address some of the damages issues the Redisis have raised on this appeal, since some money will be due no matter what. The Redisis bring two distinct challenges

to the district court's calculation of damages totaling over $29 million. First, they argue that there was no basis in evidence for the damages award. Second, they allege that the district court wrongfully denied them the discovery they needed to present their case properly.

Cablevision had the option of recovering either statutory damages or "the actual damages suffered . . . as a result of the violation and any profits of the violator that are attributable to the violation which are not taken into account in computing the actual damages. . . ." 47 U.S.C. § 553(c)(3)(A)(i). Cablevision selected the latter option and computed its damages by making a number of assumptions. First, its damages expert, Flaim, compared Cablevision's subscription list with the names in the Redisis' "Gross Purchases" database accessed from its seized computers (the Redisis having destroyed all paper records) to create a list of 2,756 customers. He then assumed a useful life of seven years for each decoder and also assumed that each customer purchased only Cablevision's most basic cable services but had access to Cablevision's entire "Optimum Gold" package (including channels like HBO, Cinemax, and The Movie Channel). In 1999, the difference between these services was $40.25 per month. Flaim also theorized that the average cable thief viewed 15 pay-per-view cable programs per month at a total estimated cost of $114.50. This led to a total loss of $154.75 per month or $1,857 per decoder per year of service and a total loss of $29,767,710. Flaim's analysis was accepted in its entirety by the district court.

Damages based on lost revenues are by their very nature incapable of mathematical precision. Thus we will uphold a district court's damages determination under the clear error standard as long as the award was based on reasonable estimates. *Bob Willow Motors, Inc. v. General Motors Corp.*, 872 F.2d 788, 798-99 (7th Cir. 1989). The real question, however, is how one should determine a

cable company's "actual damages." Cablevision seems to believe that its damages are equivalent to the cost it would have charged a cable thief for the services she obtained through the use of the Redisis' decoders. Thus, if a viewer spent a few seconds scanning through twenty or so pay-per-view movies with his remote control, and each movie costs $5, Cablevision would assess its damages at $100.

We have difficulty with this method of calculation. Few rational viewers would pay $100 for the privilege of viewing a few seconds of twenty different movies; the action is only taken because through use of the decoder the service becomes free. Another way of stating this fact is that absent the decoder, a viewer would not use the same cost of services. And the marginal costs of providing "Optimum Gold" or a pay-per-view movie to one additional subscriber are surely minimal. Thus, the "actual damages" suffered by Cablevision, *i.e.*, the value of what has been taken from it, is the amount it would have received for the services that its viewers would have demanded absent the decoders, less the cost of providing those services (which may or may not be negligible). One could even assume that viewers willing to accept the risk of discovery and prosecution for cable theft are users who consume large amounts of cable services and would watch more pay-per-view features than the average cable customer. Even so, however, there must be some evidentiary basis for determining what that figure would be.

In this case, however, Flaim made no effort to tie his damages calculation to any actual viewer habits. As best we can determine, his finding that the average cable thief would watch "ten low-priced movies and five higher-priced events such as concerts, boxing matches and wrestling events" is based on nothing more than guesswork and Flaim's own viewing habits. While we have no problem with the basic premise that uncertainties as to dam-

ages should be resolved against the wrongdoer, *BE&K Constr. Co. v. Will & Grundy Counties Building Trades Council*, 156 F.3d 756, 770 (7th Cir. 1998), this does not give an injured party carte blanche to provide wild guesses at its damages. A reasonable estimate as to pay-per-view usage must be grounded in some record evidence, not numbers pulled from thin air. *MindGames, Inc. v. Western Publ'g Co.*, 218 F.3d 652, 658 (7th Cir. 2000) ("Damages must be proved, not just dreamed. . . ."). Indeed, the very calculations Flaim made were rejected as "rank speculation" in a similar case in another court. *CSC Holdings, Inc. v. New Info. Tech., Inc.*, 148 F. Supp. 2d 755, 759 (N.D. Tex. 2001). On remand, Cablevision must tie its estimates to real-world figures of customer usage if it wishes any such damages award to be upheld.

One other problem with Cablevision's damages calculation is also evident on the record before us. Flaim set damages for illegal access to "Optimum Gold" based only on Cablevision's 1999 cable rates, even though much of the damages stemmed from asserted violations in other years. Surely Cablevision must have access to its own rates in earlier years. These rates must provide the basis for calculations of damages for the years in question. One cannot rely on estimates when the actual data is readily available.

The Redisis also allege that the district court erred in denying them discovery of certain records. Most notably, the district court denied the defendants access to Cablevision's subscriber lists on the ground that they were "cable pirates." This unqualified ruling went too far. "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." FED. R. CIV. P. 26(b)(1). As the Redisis point out, these subscriber lists were relevant to their efforts to present an alternative and lower calculation of damages than the $29 million figure submitted by Cablevision. Flaim

accidentally may have included customers who subscribed not to Cablevision but to a competing service provider. Beyond this, some of the customers may have purchased "Optimum Gold" or pay-per-view movies even when they did own a decoder, and, if so, their damages for those sales should be reduced. But the Redisis had no way of raising these points or challenging Flaim's figures without access to the same customer databases that Flaim had. There is no privilege or restriction on releasing customer records to a non-governmental entity pursuant to a court order. 47 U.S.C. § 551(c)(2)(B). Therefore, the district court should have granted the Redisis some form of access to the subscription lists.

The district court appears to have feared that turning over customer databases to "cable thieves" would allow the Redisis to return again to their illegal ways. This concern may have been realistic, but there are mechanisms short of an outright denial of discovery to deal with it. The court could have crafted a protective order under FED. R. CIV. P. 26(c). In such an order, the court could have permitted Cablevision to redact unnecessary information from the records, required that all review be conducted *in camera*, or permitted only the Redisis' attorneys to be present to view the documents. Each of these solutions would have made it possible for the Redisis to mount a defense; the outright denial of access to customer lists did not.

We encourage the district court to explore these and other options in crafting a solution that will enable both parties to provide reasoned estimates of Cablevision's damages. Since we are already reversing the judgment for further proceedings on the statute of limitations issue, we need not address each of the parties' other damages discovery disputes point-by-point. Instead, we are confident that such discretionary decisions can be better resolved by the district court in the first instance.

**IV**

As a final matter, the Redisis contend that the district court's order freezing their business and personal assets was unlawful under *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999). That decision held that a district court may not issue an injunction freezing assets in an action for money damages where no equitable interest is claimed. *Id.* at 333. However, the court specifically noted that a restraint on assets was still proper if a suit sought equitable relief. *Id.*; see also *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 288 (1940). Here Cablevision had the option of seeking either statutory damages, actual damages, or an accounting and profits remedy. 47 U.S.C. § 553(c)(3)(a)(1). This last remedy, sought by Cablevision in the alternative in its initial complaint, is equitable in nature and imposes a constructive trust on the defendant. An asset freeze is thus proper to stop cable piracy that violates the Communications Act. *TKR Cable Co. v. Cable City Corp.*, 267 F.3d 196, 208 n.4 (3d Cir. 2001). Since the assets in question here were profits the Redisis made by unlawfully stealing Cablevision's services, the freeze was appropriate and may remain in place pending final disposition of the case.

**V**

The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion. Circuit Rule 36 shall apply on remand.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*