In the

# United States Court of Appeals
### For the Seventh Circuit

Nos. 01-3826 and 01-3827

DESIGNER DIRECT, INC.,

*Plaintiff-Appellee,*
*Cross-Appellant,*

*v.*

DEFOREST REDEVELOPMENT AUTHORITY,

*Defendant-Appellant,*
*Cross-Appellee.*

KERRY LEVIN,

*Counter-Defendant,*
*Appellee.*

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 01 C 40 S—**John C. Shabaz**, *Judge.*

ARGUED SEPTEMBER 10, 2002—DECIDED DECEMBER 13, 2002

Before FLAUM, *Chief Judge*, and BAUER and MANION, *Circuit Judges*.

BAUER, *Circuit Judge.* This case arises out of a contractual relationship between Designer Direct, Inc. d/b/a/ Levin Associates Architects ("Levin") and the DeForest Redevelopment Authority ("DRA"). The contract between the parties involved the redevelopment of the downtown area of DeForest, Wisconsin. Levin brought a breach of contract claim against the DRA after the DRA failed to provide

certain services required by the contract. The DRA filed a counterclaim alleging that Levin's actions constituted a breach of contract. After a bench trial, the district court found the DRA breached the contract but limited damages to only certain aspects of the breach. The district court entered a judgement in favor of Levin for $85,270.02 and dismissed the DRA's counterclaim. Both parties filed notices of appeal. Levin bases its appeal on the district court's denial of reliance damages. The DRA contends that the district court erred when it granted judgement in favor of Levin and denied its counterclaim. For the reasons set forth below, we reverse and remand in part, and affirm in part.

BACKGROUND

In 1995, the Village of DeForest ("Village") devised a plan to revitalize its downtown area. The Village sought to create a downtown district that, as the center of community life, would generate increased property, sales, and income taxes for the town. To accomplish this, the Village created a separate entity, the DRA, which was responsible for the redevelopment. The Village also established a Tax Incremental Financing District, which would encourage investment in the downtown. The DRA chose Levin to create a redevelopment plan to achieve the goals of the DRA. The parties entered into a redevelopment plan agreement and a Phase I sub-agreement in October 1996.

Phase I consisted primarily of the creation of a redevelopment plan. Phase I established Levin as the developer. As developer, Levin was responsible for finishing the remainder of the redevelopment plan. The parties entered into a second agreement in August 1998 reflecting the new arrangement. This contract consisted of two more phases. Phase II concerned the construction of the infrastruc-

ture which would support Levin's plan and Phase III dealt with the sale of the land and the subsequent construction.

A synopsis of the agreement is as follows: Levin was required to purchase land obtained by the DRA and construct buildings on it. These buildings would increase the value of the property to at least $12,000,000.00. Assuming everything went according to plan, this increase in property value would result in increased tax revenues for the Village.

The plan ran into snags. To begin with, the DRA had a contractual obligation to provide a full-time liaison to work with Levin but failed to do so. The DRA assigned one Joan Laine to be the designated liaison, but she worked only two days a week. To meet the problem, Levin hired outside sources to provide liaison services at a cost of $20,000.00. The DRA reimbursed Levin but Levin objected to the DRA's failure to appoint a full-time liaison. Levin presented amendments to the contract in an attempt to negotiate a resolution of the liaison problem but without success.

Another area of dispute between the parties involved an area of land known as Carriage Way. The contract required the DRA to acquire parcels of land identified in the redevelopment plan. The agreement also required the DRA to prepare the parcels for development and convey them to Levin at the appropriate time. The redevelopment area known as Carriage Way, experienced problems from the start. Plans were behind schedule and the parcel sizes were constantly being changed by the DRA. This confusion hampered Levin's ability to perform infrastructure work on Carriage Way and resulted in costs to Levin of approximately $490,000.00 in architectural design, drawings, and engineering changes in the Phase III property development. In addition, the modifications frustrated

Levin's ability to purchase the land when the DRA demanded payment on the original closing date. Levin objected to the closing date because there was, among other things, a lack of infrastructure, a lack of zoning, and a lack of building permits. The DRA refused to extend the closing date and notified Levin that it was in breach but took no other action.

The parties' relationship finally broke under the strain of a disagreement over plans to build a public library. A major goal of the redevelopment project was to find an entity to serve as an anchor tenant. It became apparent that a public library in the downtown area would be a plausible anchor tenant. The DRA authorized Levin to contact the DeForest Library Board about the construction of a new library in the downtown area of the city. Under the agreement, Levin had the right to purchase and develop the land where the DRA wanted to put the library. The DRA wanted Levin to give up its right to purchase the land so that the library could be developed on that site. Levin agreed to this on the condition that it would be given the job of overseeing the design and construction of the library. Levin prepared a four-party agreement concerning the proposed library site. The DeForest Library Board was willing to sign the agreement; the DRA refused. Levin contends, and the district court found, that there was a secret meeting between the DeForest Library Board and the DRA in which the DRA suggested that the Board delay the library development plan. The DRA contends that Levin's construction manager was present and thus the meeting was not secret. The secrecy of the meeting notwithstanding, Levin became aware that the Library Board would likely delay a month before signing any agreement. At this point Levin elected to terminate all contacts with the DRA.

Levin filed a complaint against the DRA for failure to pay fees and expenses, failure to return earnest money,

and contractual breaches of the Phase II and III agreement.[1] The DRA filed a counterclaim against Levin for failure to develop a new tax base, failure to purchase land, and failure to construct infrastructure improvements as provided for in the contract.

After a bench trial, the district court entered judgment in favor of Levin in the amount of $85,270.02 and dismissed the DRA's counterclaim. The damages awarded to Levin consisted of the return of $50,000 of earnest money and approximately $35,000 in billed fees. While the district court found the DRA breached the Phase II and III agreements, the court did not award Levin damages for the breach of contract claims.

## ANALYSIS

### I. *The Liaison Requirement*

One of the main disputes in this case is the liaison requirement under Section 2.5 of the contract. This provision states in part:

> In the event the DRA shall default on its obligation to provide a designated representative to perform the required tasks, and failure to cure the default upon reasonable written notice from the Developer, Developer shall be entitled to a change order authorizing the necessary work by Developer and making appropriate adjustments to the deadlines and compensation as provided in secs. 4.1, 4.2, 4.3, and/or 5.9.

---

[1]  Levin also alleged tortious interference on the part of the DRA but the district court dismissed this cause of action at summary judgement. This claim has not been pursued on appeal.

Our inquiry into this contract dispute is governed by Wisconsin law.[2] Under Wisconsin law, whether the DRA breached Section 2.5 is a matter of contract interpretation and is a question of law. *Harris v. Metro. Mall*, 112 Wis. 2d 487, 503 (Wis. 1983). Following a bench trial, we will review the district court's conclusions of law de novo. *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 656 (7th Cir. 1995).

The district court determined the DRA breached the contract when it failed to provide a designated liaison. The DRA does not dispute its failure to provide a liaison. The DRA does argue that its failure to appoint a liaison was remedied by its willingness to refund Levin for any costs it incurred for liaison services.

In essence, the DRA maintains that its commitment to refunding these costs was sufficient to meet its contractual obligation. This confuses a remedy provided in the contract with the absence of a breach. The DRA fails to recognize the consequences of its inaction. By halfheartedly following its duties under the liaison provision, the DRA left Levin in a precarious position. The parties clearly agreed upon the designation of a full-time liaison. In the beginning of the relationship, the DRA provided a liaison, Joan Laine, who only worked two days a week. Later, Duane Gau, the Village Administrator, took up the liaison duties, but was even less available than Joan Laine. Following these unsuccessful arrangements, the DRA assigned a planning intern to fulfill the liaison duties. The DRA's unorganized and haphazard approach to the liaison service had detrimental effects on the quality and efficiency of Levin's work. The liaisons were achieving little of what the contract required or Levin

---

[2] The contract between the parties contains a choice of law provision which states, "This Agreement shall be governed by and construed according to the laws of the State of Wisconsin."

intended. Important aspects of the development plan such as completing promotional work, organizing hearings, obtaining necessary approvals, and acting as an interface with various governmental agencies were delayed or neglected. All of this culminated in delays to the redevelopment plan and undermined Levin's efficiency and effectiveness.

While it is true that the DRA faithfully repaid Levin for any costs incurred as a result of paying for liaison services, the DRA fails to recognize that there was more than just failing to comply with the liaison provision. Levin was forced to work in a climate rife with disorganization and inefficiency. Levin had to deal with the additional headaches of finding outside resources, negotiating costs, and evaluating the efficiency and ability of these outside sources. These problems created additional costs which deprived Levin of what it expected from the contractual relationship. For these reasons, we find the district court's determination that the DRA breached the agreement by failing to provide liaison services was correct.

The DRA next contends that even if it breached this provision of the agreement, it was not a material breach. The issue of whether a party's breach is material presents a question of fact. *Mgmt. Computer Servs., Inc. v. Hawkins*, 206 Wis.2d 158, 184 (Wis. 1996). We review findings of fact for clear error.

A breach is material if it destroys the essential object of the agreement. *Ranes v. Am. Family Mut. Ins. Co.,* 219 Wis.2d 49, 57 (Wis. 1988). The district court found that each of the DRA's breaches were material because they went to the "core purpose," the "very essence of the Agreement." The failure to appoint a full-time liaison not only placed a strain on the relationship between the parties, but also resulted in a waste of time and resources on the part of Levin in trying to secure an outside source for the liaison work. This was documented by Levin in a letter it sent to the DRA on April 13, 1999:

> Throughout the course of the project, our office has regularly reminded both staff and the DRA that the lack of a person with a full time, daily commitment has placed enormous strain on the working relationships between all parties, as well as costing our firm a considerable amount of man-hours and money in attempts to cover the liaison's responsibilities. Additionally, the absence of this person has contributed to project delays that are costly to us, as well the DRA.

The DRA points to the Restatement factors as support for its argument. However, the DRA takes an abbreviated approach in its Restatement analysis, citing *Management Computer Services, Inc. v. Hawkins*, 206 Wis.2d 158, 184 (Wis. 1996). The DRA fails to consider that *Management Computer Services* did not examine all of the factors under § 241 of the Restatement of Contracts. Since all of the factors have some relevance to the case at bar, we will consider all of them. In determining whether a breach is material, § 241 of the Restatement of Contracts lists the following circumstances as significant:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241 (1981).

Levin expected and continuously requested the DRA to appoint a full-time liaison. The absence of such a person had a particularly significant effect on Levin's ability to perform. The DRA's failure to provide a full-time liaison deprived Levin of the right to purchase and develop land because it substantially delayed and interfered with the redevelopment. An effective liaison was necessary for Levin to fulfill its duties under the contract. The district court specifically found a lack of good faith on the part of the DRA, and we cannot find fault with this decision.

Finally, the DRA argues that even if we find the breach was material, Levin waived any claim of materiality by continuing to perform under the agreement for almost two years. The question of whether materiality of a breach has been waived for purposes of justifying a right of non-performance is one of fact. *Entzminger v. Ford Motor Co.*, 47 Wis. 2d 751, 755 (Wis. 1970). We review determinations of fact for clear error.

The DRA contends that this ruling was in error because the parties performed under the contract for another two years after the DRA failed to provide liaison services. However, Levin should not be penalized because it decided to wait and see if the situation improved. Repeatedly, Levin asked the DRA to live up to its obligations to provide liaison services.

The DRA cites *Entzminger v. Ford Motor Co.*, 47 Wis.2d 751 (Wis. 1970) as support for its position. However, in *Entzminger*, the non-breaching party waited four years and based its claim on conduct that had minimal impact on the parties and the contract. Further, there was no evidence in *Entzminger* that the non-breaching party objected to the breaches. In the instant case the time period is shorter, the lack of a full-time liaison had a detrimental impact, and Levin repeatedly objected to the situation. We cannot find that Levin waived any claim that the breaches were material.

II. *Carriage Way Property*

The second point of contention between the parties involved a parcel of land known as Carriage Way. Section 5.1 of the Phase II and III agreement required the DRA to acquire parcels of land identified in the redevelopment plan. The contract also provided that the DRA prepare the land for development and convey the land to Levin. Both parties agreed that Carriage Way would be developed first. However, with the problems above recited, the project stalled, and the land was never redeveloped. The district court determined that the DRA further materially breached the contract when it insisted on the closing of the Carriage Way property before Levin was ready and when it failed to negotiate in good faith with Levin over the purchase price or the closing time.

The DRA does not deny that its actions with regard to Carriage Way amounted to a breach; rather, it contends that the breach was not material. Once more, the issue of whether a party's breach is material presents a question of fact. We will review findings of fact for clear error. *Nat'l. Solid Wastes Mgmt. Ass'n v. Meyer,* 63 F.3d 652, 656 (7th Cir. 1995).

The DRA argues that the attempted closing was not a material breach because it did not destroy the essence of the agreement. It supports its claim by pointing to the lack of evidence in the record indicating any adverse consequence material to the contract. This fails to properly consider the cumulative effect the breaches had on Levin.

As we observed in our consideration of the DRA's breach of the liaison provision, for a breach to be material it must be so serious as to destroy the essential object of the agreement. *Ranes v. American Family Mut. Ins. Co.,* 219 Wis. 2d 49, 57 (Wis. 1998). Similar to its liaison provision argument, Levin points out that the DRA's breach prevented it from buying land, entering into infra-

structure contracts, and resulted in expending additional resources on designs and drawings.

In its finding that the DRA breached the contract with regard to the Carriage Way property, the district court found that the DRA breached the expressed good-faith requirements of the contract. The testimony of Kerry Levin, the owner of Levin, reveals the difficulties Levin had with Carriage Way. A project as complex as this one must be planned well in advance. Yet the size of the final parcel for Carriage Way had been in question up until the closing date, forcing Levin to modify its designs. The modifications included eliminating garages and changing master bedroom units. In addition, Levin had to change engineering drawings for the infrastructure work and the architectural drawings. Despite this major overhaul the DRA caused by its actions, the DRA still expected Levin to close in November though Levin had not finished its architectural drawings and other designs. Kerry Levin also testified that building permits had not yet been obtained, the land was not rezoned, and the infrastructure was not yet built because Levin was still modifying the engineering.[3]

The district court also found the price charged by the DRA was in excess of the amount required by the contract. The DRA defends its actions regarding the purchase price of Carriage Way as stemming from the change of the status of a road from public to private. Thus, it claims

---

[3] In a letter dated November 16, 1999, Levin informed the DRA that it could not close until the DRA had completed the following contract terms: all demolition and hauling work on the conveyance parcels, a Phase I environmental study, final zoning modifications, receipt of building permit approvals, the parcels are accessible by road, the parcels are served by completed gas, electrical, and phone utilities, and that the parcels are served by storm, sanitary, and water service.

to be merely demanding adherence to specific contract requirements. A closer inspection reveals that there was more to this situation than the DRA suggests.

Mark Levin testified that the purchase price of Carriage Way was originally at $300,000.00. However, the DRA was charging approximately $450,000.00. The DRA apparently justified the price increase by informing Levin that future prices of land would be lowered in order to make up the difference. The result of a sale according to these terms amounted to Levin accepting a road that diminished the value of its project while simultaneously raising the price it had to pay. The DRA failed to consider the effect this price increase might have on Levin's plans or its budget. The DRA presented Levin with no alternative but to pay the increased price. It is difficult to accept the DRA's portrayal of the closing as an insistence on adhering to the contractual options. Given Levin's position at the time of the closing and its reaction to the price makes it especially difficult to accept the DRA's position. We fail to see how such actions on the part of the DRA can amount to anything other than bad faith.

For these reasons, we find the DRA violated the express provisions in the contract requiring good faith. The DRA's demand for a November closing when its own actions placed Levin in the position of being unable to meet this date exemplifies the DRA's failure to fulfill the good-faith requirements of the contract. The DRA's delays and failure to cooperate with Levin on the Carriage Way closing date and price confirm the DRA's lack of good faith. For these reasons, we agree with the district court's finding that the DRA breached the express provisions requiring good faith.

III.  *The Public Library*

The third point of contention between the parties concerns the plans to construct a public library in downtown DeForest. Levin attempted to secure a right to design and build a library on land promised to it for redevelopment. The DRA wanted Levin to give up its right to buy the land so that a library could be developed on the site. Under this proposal, Levin agreed to give up its right to purchase the land if it could design and build the library. As this proposal was about to be formally agreed to, Levin became aware that the Library Board planned to hold out on signing the agreement for another month after a secret meeting it had with the DRA.

The district court found that the DRA failed to act in good faith with respect to the library negotiations. The court based its decision on the fact that a secret meeting occurred involving all the interested parties except Levin. The district court noted that if good-faith negotiations are to exist, all parties should be present. The DRA claims that the district court erred and that the contract did not require it to negotiate in good faith with regard to the library negotiations.

Whether the DRA had a contractual duty to negotiate in good faith is a matter of contract interpretation and a question of law. *Harris v. Metro. Mall*, 112 Wis. 2d 487, 503 (Wis. 1983). We review questions of law de novo.

The provisions of the Phase II & III Sub-Agreement relevant to the library negotiations include the following:

> Section 5.1. Notwithstanding the foregoing, if due to environmental contamination or other conditions or circumstances DRA cannot obtain any parcel at what it deems a reasonable cost, Developer agrees to meet with DRA or its representative and negotiate in good faith for adjustment of the Redevelopment Plan and the terms of this Agreement to avoid, if possible, the need to acquire such parcel(s).

> Section 5.10. In the event the Redevelopment Plan is modified resulting in a positive economic benefit to the project (including, but not limited to, inclusion of a new public library or a new restaurant), . . . the parties shall meet and negotiate in good faith for appropriate adjustments to the amount of guaranteed development value as provided in sec. 5.8, the development phasing as provided in sec. 5.9 and/or the promotional efforts and expenditures as provided by secs. 3.2 and 4.1, considering such factors as the . . . reasonable expectation of the parties at the time of execution of this Agreement and any other factors which have, or are expected to, increase or decrease the overall expense or benefits from the project to the Developer or DRA from any other previously unanticipated changes in circumstances.

The DRA misreads the plain language of Section 5.10 and attempts to devise an interpretation of it that simply ignores the unambiguous nature of Section 5.10. We agree with the DRA that Levin had no contractual right to build a library. But this does not preclude the DRA from acting in good faith when it negotiated with Levin about the library. Contractual language is ambiguous only when it is "reasonably or fairly susceptible of more than one construction." *Borchardt v. Wilk*, 156 Wis.2d 420, 427 (Ct. App. 1990). Unambiguous contractual language must be enforced as written. *Dykstra v. Arthur G. McKee & Co.*, 92 Wis.2d 17, 38 (Ct. App. 1979). We cannot agree that the contractual language at issue is ambiguous. Section 5.10 specifically asserts that the parties are to "negotiate in good faith" if a new public library is included in the plan.

The DRA also points out that 5.10 delineates the specific subjects to which the parties must negotiate in good faith. It then notes that construction of the library was not one of them. The DRA focuses its attention on the following passage of Section 5.10: "the parties shall meet and negotiate in good faith for appropriate adjustments

to the amount of guaranteed development value as provided in sec. 5.8, the development phasing as provided in sec. 5.9 and/or the promotional efforts and expenditures as provided by secs. 3.2 and 4.1." It is true that Section 5.10 limits what the good-faith conduct applies to. However, once the DRA, Library Board, and Levin began negotiating about the possible construction of a public library in downtown DeForest, we think those aspects specifically listed in 5.10 came into effect, invoking the DRA's duty to negotiate in good faith.

After finding these good-faith provisions of the agreement apply, we must consider whether the DRA breached them in its negotiations concerning the library. The district court found that there was a secret meeting between the DRA, the DeForest Village Board, and the Library Board and that this meeting constituted bad faith negotiations. The determination that a secret meeting occurred is a question of fact.

The DRA argues that the meeting was not secret, that there was in attendance Levin's construction manager, Scott Pulvermacher. The significance of Pulvermacher's alleged presence is questionable. Pulvermacher never was called as a witness, nor was he ever deposed, leaving the reality of the DRA's position in doubt. The record instead demonstrates the importance the DRA placed on keeping the meeting secret. An email sent to members of the Library Board noted, "Please do not disclose this meeting to the other members of your staff or Levin." The same email later states, "Amy and Dan do not disclose this meeting to Levin or his staff." The DRA never addresses this correspondence between it and the Library Board. We agree with the district court that backroom deals between parties conspiring to outmaneuver the other party to the contract do not epitomize good-faith negotiations. The district court found that no representative of Levin was present at the meeting, and given the factual surroundings, we find no error in its assessment.

IV. *Implied Covenant of Good Faith*

Amidst the various breaches found by the district court, it also determined that the DRA breached the implied covenant of good faith. Wisconsin law recognizes an implied covenant of good faith and fair dealing in every contract. *Wis. Natural Gas Co. v. Gabe's Constr. Co.*, 220 Wis. 2d 14, 21, 582 N.W.2d 118, 121 (Ct. App. 1998). Wisconsin law further imparts a duty of cooperation between the parties to a contract. *Id.* In explaining what good faith means, Wisconsin law defines good-faith conduct in the negative:

> Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

*Foseid v. State Bank*, 197 Wis. 2d 772, 796-97, 541 N.W.2d 203, 213 (Ct. App. 1995).

We need not pigeonhole the DRA's conduct into one of these categories. The DRA's actions represent many of these types of bad faith conduct. The DRA's only argument on this question is that the district court made contradictory findings with respect to the issue of good faith and therefore made a mistake of law. It notes the district court's finding that "this contract was founded on ongoing cooperation and there is no question that the witnesses who testified here from the defendant were implementing the spirit of that bargain" as support for its position. The

DRA's claim misses the import of the district court's ultimate finding. The district court noted that it found good faith in the "witnesses who appeared." The court was not addressing the DRA's actions as a whole. Instead, the district court went on to say:

> I believe the lack of a liaison did undermine the communication, the cooperation essential to successful completion of the contract. The Court believes there may very well have been the unreasonable insistence on Carriage Way closing with a threat to terminate, failure to renegotiate the good faith as required by the contract, and of course the construction of the library contract. Again that's directly relating to long-term cooperative behavior.

Taking the DRA's conduct as a whole, we agree with the district court that the DRA's actions violated the standards of fairness and reasonableness. Spanning the entire contractual relationship reveals that the DRA was uncooperative, evasive, and at times uninterested in the project. Unreasonable delays with the liaison service adversely affected Levin's performance in multiple ways. The Carriage Way endeavor accomplished nothing because of the DRA's disorganized performance. Finally, the library negotiations revealed the DRA's abuse of power and interference with Levin's attempts at developing a public library in downtown DeForest. In sum, these actions reveal a clear breach of Wisconsin's implied covenant of good faith.

The DRA's sole response that the district court found some of its witnesses implemented the spirit of the bargain does not persuade us. The argument not only ignores a substantial portion of the district court's finding but also lacks any legal authority supporting its position. We therefore affirm the district court's ruling that the DRA breached the implied covenant of good faith and fair dealing.

V. *Damages*

Not surprisingly, the parties also disagree over the district court's decisions regarding damages. The district court found that Levin was entitled to receive damages and awarded Levin damages consisting of unpaid invoices of $35,270.02 and the return of earnest money totaling $50,000.00. In this appeal, Levin argues that the district court erred when it refused to grant it reliance damages. The DRA, on the other hand, claims that the district court erred when it awarded Levin the $50,000.00 in earnest money and the $35,270.02 in unpaid fees. We review the determination of damages for clear error. *CSC Holdings, Inc. v. Redisi*, 2002 U.S. App. LEXIS 22487 at *15 (7th Cir. 2002).

We will first consider the DRA's argument that Levin is not entitled to the damages awarded by the district court. The district court awarded Levin $50,000.00 of earnest money because the failure to close on the purchase of Carriage Way was not Levin's fault. The DRA argues that Levin is not entitled to the earnest money because it never purchased any parcels of land.

The DRA attempts to deflect attention away from its conduct during Phase I and II by arguing that Levin's inaction in Phase III supports the finding that it is not entitled to the $50,000.00. According to the DRA, Levin is not entitled to recover the $50,000.00 because it never purchased any parcels during Phase III. This argument fails to consider the real reason for this outcome. The very reason the parties never reached Phase III, the actual development, was due to the evasive conduct of the DRA. To place blame on Levin for something that it not only had no control over, but was also in actuality the fault of the DRA, is an argument that we reject.

The DRA next claims that, in addition to the factual basis noted above, there is a legal basis for its argument

that Levin is not entitled to the earnest money. It cites, as support for its position, *Schwartz v. Syver*, 264 Wis. 526, 529 (Wis. 1953) (*quoting* 55 Am. Jur., Vendor and Purchaser, § 535, p.927), which notes: "So long as the vendor is not in default and is willing and able to perform, the purchaser cannot wrongfully refuse to complete the transaction and recover what he has paid toward the purchase money." The DRA fails to consider that the relationship in this case was not the typical buyer-seller relationship that this statement envisions. The DRA and Levin were more akin to partners in a business venture. Thus, the traditional vendor type analysis which the DRA refers to is legally inapposite to the underlying situation and we, therefore, find it unpersuasive. Levin's failure to close on the purchase price of Carriage Way was not its fault because the property was not available for conveyance before the termination of the contract and the trial court so found.

The DRA also contests the district court's ruling that Levin was entitled to recover $35,270.02 in billing fees. The DRA argues that the unpaid invoices were miscalculated. It claims Levin is not entitled to $35,270.02 because Levin did not consider contractor inefficiency in its calculation of the invoices. Thus, it merely disputes the accuracy of the numbers, not the validity of awarding the damages itself.

The invoices Levin submitted were based on a percentage of the work completed. Levin also submitted time records to show what was done during that time period. The DRA never objected to Levin's method of billing its services. In addition, Kerry Levin testified as an expert that the fees charged were reasonable as to the type and amount. The DRA's reliance on *Metropolitan Sewerage Com. v. R. W. Constr., Inc.*, 72 Wis. 2d 365, 241 N.W.2d 371 (Wis. 1976), is misplaced. In *Metropolitan Sewerage*, the Wisconsin Supreme Court held that the calculation for

contract damages must take into account contractor inefficiency in planning and performance. *Id*. at 382. However, the court noted "our holding here is limited to concluding that the MSC is liable for an equitable adjustment under the changed-conditions clause." *Id*. at 383-84. The case before us does not involve an equitable adjustment or a changed-condition clause. In addition, *Metropolitan Sewerage* is factually distinguishable from the case at bar. The Wisconsin Supreme Court documented the serious inefficiencies on the part of the party seeking fees for its services. *Id*. at 383. Such inefficiencies have not been alleged by the DRA. Thus, *Metropolitan Sewerage* is inapplicable to our analysis. For these reasons, we find the district court did not err in its determination of damages for the unpaid invoices.

The last issue relating to damages concerns the district court's denial of reliance damages to Levin. The district court denied Levin its reliance damages because its expenses were not incurred in reliance on any contractual obligation. The reliance damages requested by Levin would reimburse it for those expenses made in anticipation of Phase III property development. The district court's underlying reasoning for its decision centered around its finding that Levin subjectively believed it could terminate the contract without cause at anytime. On appeal, Levin argues the court erred and that it is entitled to its reliance damages.

Wisconsin law recognizes the propriety of reliance damages when proof of an expectation interest (profit) is uncertain. *Reimer v. Badger Wholesale Co.*,433 N.W.2d 592, 594 (1988). The case at bar fits that description.

The purpose behind reliance damages is to reimburse the injured party so that he is put in "as good a position as he would have been in had the contract not been made." Restatement (Second) of Contracts § 344 (1981). The dis-

trict court and the DRA give the definition of reliance damages a narrow reading. The district court noted, "Certainly the plaintiff incurred expenses in anticipation of development. But he did not do so in reliance on any contractual obligation of the defendant to proceed under the contract because he did not believe the DRA was obligated to proceed." The district court puts heavy emphasis on the phrase "contractual obligation," as if there must be some specific provision spelled out in the contract that must be relied upon for a party to recover expenses. The Restatement and case law are clear that an injured party has a right to damages based on expenditures "made in preparation for performance." Restatement (Second) of Contracts § 349(b) (1981); *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1383 (Fed. Cir. 2001). Thus, reliance damages are not limited to those expenses made in relation to duties spelled out in the contractual agreement.[4] The second vulnerable point in the district court's reasoning is that Levin is not entitled to reliance damages because it did not believe the DRA was obligated to proceed. The expenses at issue were not incurred before it made the contract. *See* Farnsworth, Contracts § 12.16, at 928 n.2 (2d ed. 1990) ("Reliance damages are limited to those expenses incurred after an agreement has been reached"). We also believe that Levin would not perform the services and work it did (over $490,000 worth) without thinking the DRA would proceed with its end of

---

[4] Restatement (Second) of Contracts § 344 (1981) states: The promisee may have changed his position in reliance on the contract by, for example, incurring expenses in preparing to perform, in performing, or in foregoing opportunities to make other contracts. In that case, the court may recognize a claim based on his reliance rather than on his expectation. It does this by attempting to put him back in the position in which he would have been had the contract not been made. The interest protected in this way is called "reliance interest."

the deal. The services Levin performed were the type that would have no value to them in another project or with a future client.

The district court analyzed the issue in a divisible time frame context. However, this project, like most complex ventures, cannot be viewed in such a fashion. Tasks such as infrastructure preparation, architectural design, and final construction plans must be developed far in advance of when they are actually to be worked on. Levin should not be punished simply for preparing for Phase III of the contract. The district court's position of viewing the contractual relationship in neat time frames led it to reject Levin's claim for reliance damages. Design, engineering, construction, and promotion costs were all incurred by Levin for its Phase III work. The precise reason the parties never reached Phase III was due to the various contract breaches of the DRA. These costs are a classic example of why reliance damages exist: to put the party in as good a position as he would have been in had the contract not been made. *See* Restatement (Second) of Contracts § 349(b) (1981).

We are not holding that any costs incurred before the contractual relationship was terminated comes under the guise of reliance damages. However, the expenses Levin incurred were made in reliance to its duties under Phase III of the redevelopment plan. If Levin had not undertaken these expenses when it did, the project would have been severely delayed. This redevelopment project was a complex, expensive, long-term undertaking. The parties interacted frequently and relied upon each other to achieve the goals of the redevelopment plan. Levin's duties included architectural work, infrastructure work, and design work which is highly technical and arduous. The expenses it incurred are a reflection of this process and the nature of the work. Without reliance damages, Levin would suffer a loss of expenses made in preparation for

the Phase III redevelopment. Thus, we find the district court erred in denying reliance damages to Levin. We reverse and remand for a determination of an award of reliance damages consistent with the facts of the record.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's decision as it relates to the judgment in favor of Levin, and REVERSE and REMAND the matter concerning the denial of reliance damages to Levin.

Costs to be assessed against defendant-appellant.

A true Copy:

      Teste:

 

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*